FARMERS AND MERCHANTS NA-
TIONAL BANK, FAIRVIEW,
Oklahoma, Appellee,

v.

SOONER COOPERATIVE, INC., State
Guaranty Bank, Appellants.

No. 64329.

Supreme Court of Oklahoma.

Nov. 22, 1988.

Shirley, Stephenson, Shirley & Webber by F. Douglas Shirley, Watonga, for appellants.

Curtis, McCue, Schoeppel & Hallren by James Schoeppel, Fairview, for appellee.

HODGES, Justice.

Two issues are presented on appeal: (1) Does a valid security interest continue in Payment–In–Kind Diversion Program benefits as proceeds of growing crop collateral? (2) Do Payment–In–Kind Diversion Program payments remain identifiable when deposited into debtors' bank account from which a check was issued to retire a loan from another creditor? We answer both questions in the affirmative.

The facts are uncontroverted. On August 25, 1982, J.C. Graham and Elizabeth Sue Graham (debtors) granted a security interest to Farmers and Merchants National Bank (F & M) in 1983 wheat crops to be grown on their Blaine County farmland.[1] The security agreement and financing statement covered "growing crops ... and proceeds thereof." F & M perfected its security interest by filing its financing statement.

The Grahams also owed appellant Sooner Cooperative, Inc. (Sooner), $14,638.34 resulting from purchases of feed, fuel and supplies. To satisfy the past due open account, the Grahams assigned their right to benefits, attributable to their Blaine County acreages, in the United States Department of Agriculture's (USDA) Payment–In–Kind Diversion Program (PIK) to Sooner on April 15, 1983. The PIK benefits were then reassigned to appellant State Guaranty Bank (SGB) on May 23, 1983, to secure a loan made to the Grahams and Coop as joint borrowers in order to pay the Grahams' open account with Sooner. The Grahams planted but never harvested their 1983 Blaine County wheat crop, opting to participate in the PIK program.

The PIK program was instituted to alleviate the oversupply of grain which had accumulated on the market. Operated by the Commodity Credit Corporation (CCC), a branch of the USDA, the program gave participating farmers a quantity of grain in return for crops that would otherwise have been produced. The quantity of grain was based on past production records and the number of nonproducing acres. Payment from the CCC was often in the form of grain stored on the farmer's land from an earlier harvest. In a series of paper transactions, designed to avoid actually moving the grain, the CCC would purchase the farmer's stored grain and credit it as payment in kind for the 1983 PIK program. The grain was then sold and the farmer received a check.

Upon receipt of the PIK payment, on August 1, 1983, J.C. Graham deposited it into the Grahams' checking account at Liberty Bank in Oklahoma City. The following day he issued a check for $15,027.74 to SGB as payment in full of the May 23, 1983, promissory note.

F & M received none of the PIK benefits. The Grahams defaulted on the F & M note and declared bankruptcy in September, 1983. F & M filed an action against SGB and Sooner (appellants) alleging conversion of the PIK benefits as proceeds of its collateral.

The case was tried to the District Court of Major County on stipulated facts. The trial court concluded that the PIK benefits were identifiable proceeds of the Grahams' 1983 Blaine County wheat crop and subject to F & M's perfected security interest and that appellants had converted the PIK benefits. Judgment was entered for F & M in the amount of $16,516.13. Appellants brought this appeal.

## I.

The issue of whether PIK benefits are "proceeds" of growing crops is one of first impression in Oklahoma. F & M claims a perfected security interest in the PIK benefits by virtue of a security agreement covering the Grahams' 1983 wheat crop. Appellants argue the PIK benefits did not result from any disposition of the Grahams' crop and therefore are not proceeds but rather a separate asset assignable as collateral for their loans to the Grahams. If F & M's perfected security interest extends to the PIK benefits as proceeds of the Grahams' crops, as the trial court concluded, the subsequent assignment of these benefits to appellants was subject to that security interest.

Jurisdictions that have examined this issue are split concerning the proper classification of PIK benefits under the Uniform Commercial Code (UCC). Some courts have concluded that PIK benefits do not constitute proceeds, persuaded that PIK

---

**1.** The Grahams' 1983 Major County wheat crops were the subject of litigation in the companion case to the present action, *Farmers & Merchants*

*Nat'l Bank v. Fairview State Bank,* 766 P.2d 330 (Okla.1988).

benefits do not arise from a disposition of the debtor's "growing crops," which were never planted or plowed under before harvest.[2] These jurisdictions have classified PIK benefits as either "accounts" or "general intangibles" under the UCC, viewing the debtor's right to the benefits as a contract right. Under this approach, a creditor must list government entitlements specifically or generally, as accounts or general intangibles, in order to possess a secured interest in PIK benefits. A better reasoned approach, however, recognizes that PIK benefits are the proceeds of a valid security interest in crops.[3]

The extent of a secured party's interest in collateral is governed by article 9 of the UCC.[4] A secured party's interest in proceeds of collateral is granted automatically by section 9–203(3) even if proceeds are not mentioned in the security agreement or financing statement. Section 9–306 determines the rights of a secured party upon disposition of collateral. Under section 9–306(2), a security interest continues in collateral and identifiable proceeds of collateral.[5] Section 9–306(1) provides that " 'proceeds' *includes* whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds" (emphasis added). This nonexclusive definition of proceeds "was designed to protect a secured creditor's interest in collateral through permutations and substitutions."[6]

The drafters of the UCC intended that its provisions be construed to promote purposes of the Code and the policy of the provision in question.[7] A broad definition

---

2. *See In re Sunberg,* 729 F.2d 561 (8th Cir.1984); *In re Sumner,* 69 B.R. 758 (Bankr.D.Or.1986); *In re Boyd Elevator, Inc.,* 63 B.R. 689 (Bankr.N.D. Tex.1986); *In re Binning,* 45 B.R. 9 (Bankr.S.D. Ohio 1984); *In re Leibe,* 41 B.R. 965 (Bankr.N.D. Iowa 1984); *In re Fowler,* 41 B.R. 962 (Bankr.N. D.Iowa 1984); *In re Schmidt,* 38 B.R. 380 (Bankr.D.N.D.1984); *Fayette County Farms v. Vandalia Farms,* 167 Ill.App.3d 471, 118 Ill.Dec. 232, 521 N.E.2d 300 (1988); *O'Briant v. Sweetwater Prod. Credit Ass'n,* 745 S.W.2d 412 (Tex.Ct. App.1988).

3. *See Osteroos v. Northwest Bank Minot, N.A.,* 604 F.Supp. 848 (D.N.D.1984); *In re Kingsley,* 73 B.R. 767 (Bankr.D.N.D.1987); *In re Patsantaras Land & Livestock Co.,* 60 B.R. 24 (Bankr.D.Colo. 1986); *In re Judkins,* 41 B.R. 369 (Bankr.M.D. Tenn.1984); *In re Cupp,* 38 B.R. 953 (Bankr.N.D. Ohio 1984); *In re Barton,* 37 B.R. 545 (Bankr.C. D.Wash.1984); *In re Lee,* 35 B.R. 663 (Bankr.N. D.Ohio 1983); *Production Credit Ass'n v. Martin County Nat'l Bank,* 384 N.W.2d 529 (Minn.Ct. App.1986).

   Some courts have drawn a distinction between PIK payments resulting from abandoned or destroyed crops and payments made when crops were never planted. *See In re Schmaling,* 783 F.2d 680 (7th Cir.1986); *United States v. Carolina E. Chem. Co.,* 638 F.Supp. 521 (D.S.C. 1986); *In re George,* 85 B.R. 133 (Bankr.D.Kan. 1988); *In re Clark,* 82 B.R. 131 (Bankr.D.Colo. 1987); *In re Kruger,* 78 B.R. 538 (Bankr.C.D.Ill. 1987); *In re Settles,* 69 B.R. 634 (Bankr.C.D.Ill. 1987); *In re Lions Farms, Inc.,* 54 B.R. 241 (Bankr.D.Kan.1985); *In re Mattick,* 45 B.R. 615 (Bankr.D.Minn.1985); *In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983); *First Nat'l Bank v. Milford,* 239 Kan. 151, 718 P.2d 1291 (1986). These courts have held that when no crops were planted, no security interest attached. When crops were planted, however, a security interest at-

tached and continued in PIK benefits even though the crops were abandoned or destroyed.

   Because crops were actually planted in the instant case and its companion, we need not decide whether a different decision would be reached if the wheat crops had never been planted. The result in the instant case and its companion would be the same in all jurisdictions that regard PIK benefits as proceeds of a valid security interest in crops.

4. Okla.Stat. tit. 12A, §§ 9–101 to 9–507 (1981). All UCC references are to the Oklahoma provisions found in title 12A.

5. Section 9–306(2) provides:
   Except where this article otherwise provides, a security interest continues in collateral, notwithstanding sale, exchange or other disposition thereof, unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

6. *Brown v. First National Bank,* 617 F.2d 581, 584 (10th Cir.1980). The Tenth Circuit examined the definition of proceeds under Oklahoma law in the context of fire insurance payments paid following the destruction of collateral in which the bank held a perfected security interest. The case came before the court prior to Oklahoma's adoption, in 1981, of the 1972 amendment of section 9–306(1) which now defines as proceeds "[i]nsurance payments from any source by reason of loss or damage to the collateral." Casualty insurance payments were held to be included in the liberal definition of proceeds.

7. Section 1–102 provides in part:
   (1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

of proceeds under section 9–306 is consistent with that section's language and its policy of giving a secured party a claim to the proceeds of collateral. The definition of proceeds is broad enough to include PIK entitlements.

Although not literally the proceeds of specific crops grown by the Grahams, the PIK benefits were a substitute for their 1983 wheat crop. As the USDA noted:

> Payments in kind are intended to compensate producers who have reduced their acreages which would have otherwise been planted to the 1983 crops.... Accordingly, quantities of these commodities which are made available as payment-in-kind are considered to be 1983 production.[8]

The PIK benefits were intended to replace funds that would have been available from the sale of the 1983 crop.[9]

PIK benefits are very similar to other agricultural entitlements that have been held to be proceeds of crops.[10] Agreements securing crops are made with an awareness of the importance of federal programs such as PIK and third parties can be expected to know that crop producers are entitled to various government payments.[11] There is no reason to treat PIK benefits differently from other agricultural entitlements.

> (2) Underlying purposes and policies of this act are
> (a) to simplify, clarify and modernize the law governing commercial transactions;
> (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
> (c) to make uniform the law among the various jurisdictions.
> ....
> Comment 1 to this section explains:
> The Act should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.

The drafters clearly intended that the UCC be read purposefully rather than literally.

By perfecting a security interest in all growing crops, an interest was conveyed not only in all revenues resulting from the crop growing activity, but also in revenues received in substitution of crop production. Therefore, F & M's security interest covered PIK benefits. To hold otherwise would permit a farmer to abandon farming activities and receive PIK benefits without regard for creditors' interests.[12] A farmer's participation in the PIK program should not vitiate a valid security interest in his crops.

The description of collateral in the security agreement and financing statement as "growing crops" included PIK benefits as proceeds. "A flexible interpretation of the concept 'proceeds' promotes responsible management of farming operations by allowing alternatives to growing crops while simultaneously protecting creditors' security interests."[13] The trial court correctly held that PIK benefits are proceeds of crops.

## II.

As a second argument, appellants argue that even if the PIK payments to the Grahams constitute proceeds, F & M's security interest continued only in "identifiable" proceeds. Appellants urge the application of section 9–306(4) to determine

---

**8.** 48 Fed.Reg. 9,233 (1983).

**9.** *Barton,* 37 B.R. at 547 (PIK benefits stand in "direct substitution" of crops).

**10.** *See, e.g., In re Dettman,* 84 B.R. 662 (Bankr. 9th Cir.1988) (Raisin Industry Diversion Program payments); *In re Munger,* 495 F.2d 511 (9th Cir.1974) (farm subsidy and abandonment payments); *First Mich. Bank v. Van Rhee,* 681 F.Supp. 1264 (W.D.Mich.1987) (Dairy Termination Program payments); *In re Mahleres,* 53 B.R. 86 (Bankr.D.Colo.1985) (wool incentive payments); *In re Hollie,* 42 B.R. 111 (Bankr.M. D.Ga.1984) (Milk Diversion Program payments); *In re Nivens,* 22 B.R. 287 (Bankr.N.D.Tex.1982) (crop deficiency and disaster payments).

**11.** *Munger,* 495 F.2d at 513.

**12.** *Cupp,* 38 B.R. at 956; *Judkins,* 41 B.R. at 373. *But see Schmaling,* 783 F.2d at 684.

**13.** *Judkins,* 41 B.R. at 373.

whether the PIK payments remained "identifiable" proceeds when they were deposited into the Grahams' checking account. That section, however, controls a creditor's rights to proceeds of collateral in "insolvency proceedings."[14] Because this is not an insolvency proceeding, section 9–306(4) is inapplicable. The balance of section 9–306 must be applied to determine F & M's rights to the PIK benefits as proceeds of its collateral.

Any claim to proceeds is subject to the section 9–306(2) limitation that a creditor's security interest continues only in "identifiable" proceeds.[15] This requirement can be particularly problematic when cash proceeds[16] are deposited into a debtor's account and commingled with funds that are not proceeds. Cash proceeds do not, however, become unidentifiable merely upon deposit into a debtor's general business account.[17] The "identifiable" requirement "can be satisfied by the use of common tracing principles."[18]

The goal of "tracing" is to establish what portion of a commingled account constitutes proceeds of the collateral. In factually traceable situations, where proceeds can actually be traced into and out of an account, no resort to artificial tracing methods is needed.[19] The cash proceeds in this case, the payments from participation in the PIK program, were actually traced into the Grahams' account and out again in the form of a payment to SGB. Additionally, all evidence at trial, particularly the testimony of J.C. Graham, demonstrated Mr. Graham's intent to pay the Sooner account with the PIK payment. F & M's security interest in these identifiable cash proceeds continued unless the funds were transferred to SGB in the ordinary course of business.[20]

The UCC does not define a "transfer in the ordinary course of business." However, the decision in *Anderson Clayton & Co. v. First American Bank* provides a definition.[21] The *Anderson* Court looked to the UCC definition of "buyer in

---

**14.** Section 1–201(22) defines "insolvency proceedings" to include "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." Although the Grahams declared bankruptcy the month following their receipt of the PIK payment, this action was not brought against the Grahams and is not intended to liquidate or rehabilitate their estate.

**15.** *See supra* note 4.

**16.** Section 9–306(1) explains that "[m]oney, checks, deposit accounts and the like are 'cash proceeds'. All other proceeds are 'noncash proceeds'." The payment of PIK benefits to the Grahams constituted cash proceeds of their 1983 wheat crop.

**17.** The commingling of proceeds is specifically authorized by section 9–205 which provides:

A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral ... or to use, commingle or dispose of proceeds....

This section clearly defeats any argument that commingling makes proceeds per se unidentifiable.

**18.** *Anderson, Clayton & Co. v. First Am. Bank,* 614 P.2d 1091, 1094 (Okla.1980). Section 1–103 allows general principles of law to supplement code provisions unless displaced by a UCC section.

**19.** Examples of artificial tracing methods include the "lowest intermediate balance" (LIB) and "first in first out" (FIFO) methods of tracing commingled proceeds. Such methods apply only when deposited proceeds have completely lost their identity.

Appellants urge that because section 4–208(2) adopts the FIFO Rule for determining a collecting bank's security interest in items in a single deposit, the rule should be applied as a general tracing rule to commingled proceeds. The issue, however, is not implicated by the instant facts because the proceeds are actually traceable.

**20.** Comment 2(c) to section 9–306 explains:

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

**21.** 614 P.2d at 1094.

the ordinary course of business"[22] and the comments to section 9–306 and concluded that the drafters intended a transfer to be in the ordinary course of business when a transferee took in good faith and without knowledge that the transfer was in violation of a third party's security interest in the proceeds.

In the instant transaction, appellants cannot be said to lack knowledge of F & M's security interest in the proceeds of its collateral. F & M's filed financing statement covering the Grahams' crops and proceeds of those crops provided sufficient information to put appellants on inquiry[23] as to F & M's security interest in cash proceeds in the form of PIK benefits. Due to this knowledge, the transfer was not in the ordinary course of business and was subject to F & M's security interest.

F & M's perfection of its security interest continued in identifiable cash proceeds from the PIK program. Section 9–306(3) provides:

> The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless
>
> . . . .
>
> (b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds;
>
> . . . .

Appellants admit that F & M held a perfected security interest in the original collateral, the Grahams' 1983 Blaine County wheat crop. F & M also held a continuously perfected interest in the PIK payments as identifiable cash proceeds of the collateral. No action beyond the perfection of its security interest in the original collateral was required of F & M in order to preserve its security interest in identifiable cash proceeds.

Appellants wrongfully assumed the right to proceeds of F & M's collateral. "Any illegal taking or wrongful assumption of rights of another to personal property constitutes conversion."[24] The trial court did not err in so holding.

AFFIRMED.

DOOLIN, C.J., HARGRAVE, V.C.J., and LAVENDER, OPALA, ALMA WILSON and SUMMERS, JJ., concur.

SIMMS and KAUGER, JJ., concur in part, dissent in part.

---

**22.** Section 1–201(9) defines a "buyer in ordinary course of business" as one who buys "in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods."

**23.** Comment 2 to section 9–402 describes a financing statement as a simple notice that "indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties may be necessary to disclose the complete state of affairs."

**24.** *Davidson v. First Bank & Trust Co.,* 609 P.2d 1259, 1261 (Okla.1976).