**J.I. CASE CREDIT CORPORATION,**
**a Wisconsin Corporation,**
**Plaintiff–Appellee,**

v.

**FIRST NATIONAL BANK**
**OF MADISON COUNTY,**
**Defendant–Appellant.**

**No. 91–3531.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1992.

Decided April 19, 1993.

Michael K. McCrory, Barnes & Thornburg, Indianapolis, IN, Eric J. Magnuson (argued), Steven J. Kluz, Rider, Bennett, Egan & Arundel, Minneapolis, MN, for plaintiff-appellee.

Steven H. Ancel (argued), Sorelle J. Ancel, Bruce D. Brattain, Ancel & Dunlap, Indianapolis, IN, for defendant-appellant.

Thomas H. Ristine, Henry A. Efroymson, Michael E. Schrader, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Indiana Bankers Ass'n, Inc., amicus curiae.

Before MANION and KANNE, Circuit Judges, and WILL, Senior District Judge.*

MANION, Circuit Judge.

James Humphrey was the sole shareholder of a business that sold, among other things, farm equipment and used cars. During 1987 and 1988, Humphrey made several large payments on debts his businesses owed to First National Bank of Madison County, Indiana (the Bank). J.I. Case Credit Corporation (Case) claimed that the money paid to the Bank included proceeds from the sale of farm equipment in which Case held a security interest. Those funds had been commingled in a checking account along with funds that Humphrey had obtained from other business ventures, including used car sales. Case sued the Bank for conversion, fraud, and unjust enrichment. After a bench trial, the district court awarded Case over $188,000.00. The Bank appeals. Because we conclude that the district court clearly erred in finding that Humphrey did not pay the Bank in the ordinary course of business, we reverse.

## I.

Humphrey was the sole shareholder and chief operating officer of W.H. Hardy & Sons (Hardy), until 1985 a dealer of International Harvester farm equipment. In 1984, Humphrey, faced with a slumping agricultural equipment market, expanded his business to include the sale of used cars. Humphrey financed his purchases of used cars through a floor-plan arrangement with the Bank. Besides this floor-plan loan, Humphrey had several other loans outstanding from the Bank.

In 1985, J.I. Case purchased International Harvester's farm equipment business, and Hardy & Sons became a Case dealership. J.I. Case Credit financed Humphrey's purchases of Case equipment through a floor-plan arrangement. To secure payment, Case perfected a purchase money security interest in the equipment it sold to Hardy and in used equipment Hardy might receive from the sale of the Case equipment. The security interest specifically included an interest in the proceeds from the sale of any agricultural equipment covered by the security agreement. Case notified the Bank of its interest in the agricultural equipment. William Powers, the Bank's loan officer who oversaw the Bank's loans to Humphrey, knew Case held a security interest in the agricultural equipment.

Case's security agreement required Hardy to remit immediately to Case 90 percent of the proceeds Hardy acquired from farm equipment sales. The agreement also required Hardy to place all proceeds it received in "express trust" for Case, and allowed Case to ask Hardy not to commingle proceeds from farm equipment sales with any other funds. However, Case did not enforce the immediate payment requirement, nor did it ever ask Hardy not to commingle Case proceeds with other funds. In fact, Humphrey deposited Hardy's agricultural equipment sales proceeds into his business checking account at the Bank. Humphrey also deposited the sales pro-

* Hon. Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by      designation.

ceeds he received from his used car business, along with funds from other sources, into that account. From this account, Humphrey would pay all his business creditors, including Case.

From December 1987 through April 1988, Hardy sold 26 pieces of agricultural equipment. Humphrey followed his normal procedure by depositing the proceeds from these sales—$294,000—into his business checking account. During the same period, Humphrey also deposited over $388,000 of loan proceeds from the Bank and over $353,000 from other sources into the account. Case, however, received none of this money. Instead, Humphrey used the money—including part of Case's proceeds—to pay other creditors, including the Bank. From December 1987 to April 1988, Humphrey made a number of unusually large payments totalling over $603,000, all by check, to the Bank. Humphrey's loan payments to the Bank had averaged $4,000 per month in 1986 and $10,000 per month in 1987 (until December). Humphrey's decision to make these large payments to the Bank was entirely his own; the Bank had never approached Humphrey to exact expedited payments. Moreover, despite the large payments, the Bank had no actual knowledge that Humphrey was paying it with Case's proceeds.

Case apparently checked Hardy's inventory every 30 days. Humphrey, however, was able to avoid alerting Case that proceeds were owed by keeping Case equipment that he sold on Hardy's lot, thus preventing Case from discovering that the equipment had been sold. But despite this maneuver, Humphrey could not save the farm equipment business. In late April 1988, the W.H. Hardy & Sons farm equipment business closed its doors.

Shortly after the farm equipment business went under, Case found out about Humphrey's use of Case proceeds to pay other creditors. In July 1988, Case sued the Bank, claiming unjust enrichment, fraud, common law conversion, and criminal conversion (which, if established, would entitle Case to treble damages, Ind.Code. 34–4–30–1). Before trial, Case consented to dismissal without prejudice of its fraud claim, and the district court granted summary judgment for the Bank on the criminal conversion count. The unjust enrichment and common law conversion claims were tried to the judge. After trial, the district court entered judgment for Case for $188,000.

The district court expressly rejected the Bank's defenses that it was not liable to Case because Humphrey made the payments in the ordinary course of his business or because the Bank was a holder in due course of the checks it received. See Ind.Code 26–1–9–306, Comment 2(c) (ordinary course of business); Ind.Code 26–1–3–302 (holder in due course). According to the court, at the time Humphrey was making his large loan payments to the Bank, the Bank "was aware" that Hardy & Sons and the agricultural equipment market in general were doing poorly. The Bank had characterized all agricultural business loans, including Humphrey's, as "doubtful," and at the FDIC's behest had set up a special reserve to secure Humphrey's loans. Although the court found that the Bank had no actual knowledge that Humphrey had been paying it with Case's money, the court found that the Bank did know that Case had a perfected security interest in the proceeds of Humphrey's sale of Case equipment. All this, reasoned the court, "should have put a reasonable bank, exercising prudent business practices, on notice that something was awry." The court went on to find that the Bank, in spite of what it knew, did not ask any questions about the source of the funds with which Humphrey was paying it. The court therefore held that the Bank could not claim that the payments were made in the ordinary course of business or that the Bank was a holder in due course of the checks Humphrey wrote to make those payments. The Bank now appeals the district court's decision.

## II.

Before discussing the merits of this case, we must consider a question concerning our jurisdiction. 28 U.S.C. § 1291

grants us appellate jurisdiction over final decisions of the district courts. The problem here is that early in the case, the district court dismissed Case's fraud claim without prejudice. That is the last that has been heard of that claim; the district court's final judgment, entered pursuant to Fed.R.Civ.P. 58, does not mention it. Normally, a dismissal without prejudice is not final. *Ordower v. Feldman*, 826 F.2d 1569, 1572 (7th Cir.1987). If that rule applies here, the fraud claim is still alive in the district court. If so, there is no final judgment in this case because a judgment that disposes of fewer than all the claims in a multiple-claim case is not final absent express direction of entry of judgment pursuant to Fed.R.Civ.P. 54(b) (a direction the district court did not make here). *United States v. Ettrick Wood Products, Inc.*, 916 F.2d 1211, 1217 (7th Cir.1990) (per curiam).

■ But despite the lack of a final judgment disposing of Case's fraud claim, it is clear that the fraud claim has been finally decided. Case's fraud claim charged that the Bank knew that or was reckless about whether Humphrey's payments violated Case's security interest. In its opinion granting the Bank's motion for summary judgment on Case's criminal conversion claim, the district court found that "[t]he evidence adduced by the plaintiffs [Case] simply fails to show that the Bank was on notice that [Hardy] was not meeting its obligations to the plaintiffs and that the Bank was getting money to which it allegedly was not entitled." After trial, the court found that the Bank had not approached Humphrey to extract expedited payments and that the Bank did not know that Humphrey was paying it with Case's money. The court did not award judgment to Case because of any bad intent by the Bank; instead, the Bank was liable only because the information the Bank had "should have put a reasonable bank ... on notice that something was awry." This is the language of negligence, not intent or recklessness; as we will explain more fully in section III of this opinion, a finding of negligence does not support a finding of intent or recklessness. Because the district court's findings preclude any finding

of fraud, we have a final decision in this case if not a proper final judgment. Cf. *Ordower*, 826 F.2d at 1572 (dismissal without prejudice is final if it effectively terminates the litigation). Since neither party complains about the lack of a formal Rule 58 judgment mentioning the fraud claim, the district court's failure to enter such a judgment does not deprive us of jurisdiction. *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). We therefore move on to the merits.

### III.

■ It is undisputed that Case had a valid perfected security interest in the proceeds from Hardy's sale of Case farm equipment. The Uniform Commercial Code (UCC) expressly allows a secured party to obtain a security interest in proceeds. See Ind.Code 26–1–9–306(2), which provides that a "security interest continues ... in any identifiable proceeds...." As a secured party, Case may bring a conversion action to recover proceeds wrongfully paid to a third party. See *Citizens Nat'l Bank of Whitley County v. Mid–States Development Co.*, 177 Ind.App. 548, 380 N.E.2d 1243, 1244 (1978); *Harley–Davidson Motor Co. v. Bank of New England*, 897 F.2d 611, 619 (1st Cir.1990).

Case argues that these general rules mandate that Case should win. As Case notes, under Indiana Code § 26–1–9–201, "the Chapter 9 secured party, upon a debtor's default, [has] priority over 'anyone, anywhere, anyhow' except as otherwise provided by the remaining Code priority rules." *Citizens Nat'l Bank*, 380 N.E.2d at 1248. The Bank does not dispute that it received Case proceeds, or that Case's security interest was superior to any interest the Bank may have had in those funds. However, the Bank argues that where cash proceeds are commingled in a debtor's checking account, the Code has "otherwise provided" that the general priority rules should not apply. Specifically, the Bank relies on Comment 2(c) to § 9–306, which provides that

[w]here cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

Both the Bank and Case agree, based on language in *Citizens Nat'l Bank*, that Indiana has recognized Comment 2(c) as an exception to the Code's general priority rules. See 380 N.E.2d at 1250 ("conced[ing] that transferees in the ordinary course of business take free of a security interest in proceeds" but finding the exception inapplicable in that case).

Unfortunately, the Code does not specifically define "ordinary course" in the context of Comment 2(c)'s exception to the general priority rules. Compare Comment 2(c) to Ind.Code § 26–1–1–201(9), which defines a "buyer [of goods] in ordinary course of business." But while not specifically defining "ordinary course," Comment 2(c) does give some guidance as to the term's meaning. At the very least, to be made in ordinary course, payments must be made "in the operation of the debtor's business." Humphrey's payments to the Bank followed his normal procedure of paying his business debts with the commingled funds from his business checking account. There is no serious dispute that Humphrey's payments to the Bank were made in the operation of his business, and the district court did not find otherwise. Unlike the bank in *Citizens National Bank*, which unilaterally took deposited funds by way of set-offs, the Bank here received checks drawn on Humphrey's business account.

But Comment 2(c) does not bar recovery of a payment simply because it was made in the operation of the debtor's business. Even those payments are recoverable "in appropriate cases" if the transferee re-ceives those payments "out of ordinary course or otherwise in collusion with the debtor to defraud the secured party." This broadens the category of payments out of ordinary course. But how broad should that category be?

Courts have taken different approaches to this question. At least one court has questioned whether (if not held outright that) Comment 2(c) has no effect in the face of a valid security interest in proceeds. In *Linn Co-op v. Norwest Bank*, 444 N.W.2d 497 (Iowa 1989), a debtor partially repaid a bank loan with proceeds of collateral in which the plaintiff held a perfected security interest. *Id.* at 498. The bank resisted recovery, citing Comment 2(c) and arguing that it accepted the payments in the ordinary course of business. The Iowa Supreme Court rejected the bank's argument, noting that "[n]oticeably absent from the bank's argument is any effort to tie the ... language from the comment ... to some relevant statutory provision in the Uniform Commercial Code dealing with perfected security interests in proceeds." *Id.* at 498–99. Citing Code section 9–201, the court echoed the conclusion of *Citizens Nat'l Bank* that "the Chapter 9 secured party [has] priority over 'anyone, anywhere, anyhow' except as otherwise provided by the remaining Code priority rules." *Id.* at 499 (quoting *Citizens Nat'l Bank*, 380 N.E.2d at 1248). Since the court was "unable to conclude that the official comment accompanying section [9–306] rises to the status of a Code priority rule," the court rejected the bank's attempt to resist recovery of the payment because the payments were made in the ordinary course of business. *Id.*

Given the parties' agreement that Indiana would apply Comment 2(c), we do not have to consider whether the court in *Linn* was correct in refusing to give the comment any effect, or whether Indiana's courts would follow *Linn's* approach. In any event, most courts have not been as hostile as the *Linn* court appears to have been to the idea of allowing creditors paid out of a general bank account in the ordinary course of business to resist the claims

of secured parties to recover those payments. Instead, the courts generally have held that a secured party may attempt to recover commingled proceeds paid to a third party, but have looked to Comment 2(c) and analyzed whether the payments were made in the ordinary course to determine whether recovery was proper. See, e.g., *Harley–Davidson*, 897 F.2d at 620, 622; *Farmers and Merchants Nat'l Bank v. Sooner Cooperative, Inc.*, 766 P.2d 325, 329–30 (Okla.1988); *Tuloka Affiliates, Inc. v. Security State Bank*, 229 Kan. 544, 627 P.2d 816, 819–21 (1981); *Anderson Clayton & Co. v. First American Bank*, 614 P.2d 1091, 1094–95 (Okla.1980).

This still leaves the question of what "ordinary course" exactly means. The First Circuit, in *Harley–Davidson*, gave the term "ordinary course" a fairly broad meaning, limiting recovery from payees from commingled accounts to situations in which the payee has engaged in "conduct that, in the commercial context, is rather improper." 897 F.2d at 622. The First Circuit found that "good commercial reasons" justified this conclusion. "If ... courts too readily impose liability upon those who receive funds from the debtor's ordinary bank account ... then ordinary suppliers of gas, electricity, tables, chairs, etc., might find themselves called upon to return ordinary payments ... to a debtor's secured creditor...." *Id.*

We share the concerns expressed by the First Circuit in *Harley–Davidson*. Imposing liability too readily on payees from commingled accounts could impede the free flow of goods and services essential to business—including credit, the "good" supplied by the Bank—as suppliers take steps to ensure that they will ultimately not have to return the money they receive. But our notion of what constitutes good commercial policy is not sufficient to decide how broadly or narrowly to define ordinary course. We must instead seek that answer in the Code and in Comment 2(c), the language of which presumably embodies the policy choices made by the Code's drafters.

■ The Code and comment justify a fairly broad definition of "ordinary course." Comment 2(c)'s language suggests that when determining whether a payment is made in ordinary course, the most important factor to consider is the payee's knowledge about whether the payment was made with money that rightfully belongs to another. This flows from the statement that payments are recoverable "in appropriate cases" if the transferee receives those payments "out of ordinary course or otherwise in collusion with the debtor to defraud the secured party." The "otherwise" seems to associate "out of ordinary course" with collusion to defraud. If "out of ordinary course" was not meant to involve common elements with collusion and fraud, the more natural phrasing would have been "out of ordinary course *or* in collusion...."

■ The association with collusion to defraud suggests that a payment out of ordinary course is a payment received with knowledge that the money received rightfully belongs to somebody else. Collusion is "[a]n agreement between two or more persons to defraud a person...." *Black's Law Dictionary* 240 (5th ed. 1979). A person cannot agree to do something—in this case to "defraud" a secured creditor by taking money that rightfully belongs to that creditor—without knowing the object of that agreement. That means here that if we take Comment 2(c) at face value, where a debtor pays commingled funds in the operation of its business to a third party, the third party takes those funds in "ordinary course" unless it knows the payment violates a superior secured interest in those funds.

This reading of Comment 2(c) is supported by reference to Code section 1–201(9), which defines the similar term "buyer in the ordinary course of business" as one who buys "in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party...." Ind.Code § 26–1–1–201(9). The drafters' use of the same term "ordinary course" in both Comment 2(c) and § 1–201(9) makes reasonable the conclusion that "the drafters intended for the same factors [specifically stated in

§ 1–201(9) ]—good faith and lack of knowledge—to qualify a payment or transfer as one in ordinary course." *Anderson, Clayton & Co.*, 614 P.2d at 1094; see also *Sooner Cooperative*, 766 P.2d at 329–30.

In holding that Humphrey's payments to the Bank were not made in the ordinary course of business, the district court applied what is essentially a negligence standard, finding that the Bank had sufficient information "to put a reasonable bank, exercising prudent business practices, on notice that something was awry." Case cites the Oklahoma Supreme Court cases— *Anderson, Clayton & Co.* and *Sooner Cooperative*—to support its argument that this, and not a standard requiring actual knowledge, was the correct standard. It is true that *Sooner Cooperative*, at least, can be read to support Case's argument, despite the Oklahoma Supreme Court's reliance on § 1–201(9) for its statement that a transfer is "in the ordinary course of business when a transferee [takes] in good faith and without knowledge that the transfer [is] in violation of a third party's security interest...." 766 P.2d at 330. In *Sooner Cooperative*, there is no indication that the transferee actually knew about the plaintiff's security interest, much less that the debtors were violating it. Yet, the Oklahoma Supreme Court affirmed a judgment for the plaintiff because the plaintiff's "filed financing statement ... provided sufficient information to put appellants on inquiry as to [plaintiff's] security interest in cash proceeds...." *Id.*

The *Sooner Cooperative* court erred in equating the existence of a filed financing statement with the knowledge required by § 1–201(9) and, by analogy to that section, Comment 2(c) to § 9–306. The Code defines "knowledge" as "actual knowledge." Ind.Code § 26–1–1–201(25). And even "actual knowledge" that a security interest exists, standing alone, is not sufficient to render a payment out of the ordinary course of business. Section 1–201(9) requires "knowledge that the sale ... *is in violation of* the ownership rights or security interest of a third party...." A person can know that a security interest exists but

not know that a payment is being made in violation of that interest.

All that said, there are situations in which a payment may be deemed to be out of the ordinary course even though the payee did not actually know that the payment violated the secured party's interest. A person may have information causing him to suspect strongly that a payment violates a secured party's interest, yet take deliberate steps to avoid discovering more for fear of what he may learn. To consciously ignore or to deliberately close one's eyes to a manifest danger is recklessness, a mental state that the law commonly substitutes for intent or actual knowledge. See, e.g., *Salazar v. City of Chicago*, 940 F.2d 233, 238–40 (7th Cir.1991) ("deliberate indifference" in constitutional tort cases); *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1990) ("ostrich" or conscious avoidance instruction in criminal cases requiring proof of intent); *AM-PAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir.1990) (duty of care of fraud victim). " '[T]o know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault.' " *Giovannetti*, 919 F.2d at 1228 (quoting *AM-PAT/Midwest*, 896 F.2d at 1042).

While the law generally considers recklessness a proxy for knowledge or intent, it does not so consider negligence. E.g., *Salazar*, 940 F.2d at 239. This principle applies as well to the determination of whether a payment is in the ordinary course of business as it does to other areas of the law. Reference to § 1–201(9) illustrates this point. That section requires that for a person to be a buyer in the ordinary course of business, he must buy "in good faith and without knowledge...." Ind.Code § 26–1–1–201(9). The Code defines "good faith" as "honesty in fact." Ind.Code § 26–1–1–201(9). Negligence—that is, carelessness, mistake—is not dishonesty, even if the negligence is "gross." But a person who closes his eyes for fear that he may find that his accepting a payment will violate another's interests cannot be said to be acting honestly.

Thus, we conclude that under Comment 2(c), a payment is within the ordinary course if it was made in the operation of the debtor's business and if the payee did not know and was not reckless about whether the payment violated a third party's security interest. It follows that the district court clearly erred by applying a negligence standard to determine if the Bank received payments from Humphrey in the ordinary course. But do we need to remand for the district court to apply the proper standard? Given the district court's findings and the evidence in the record, remand is not necessary.

The district court specifically found that the Bank did not know that Humphrey's payments violated Case's security interest. That leaves only recklessness as a basis for liability, and the record in this case does not support a finding of recklessness. True, the Bank knew about Case's security interest. The district court relied upon this knowledge along with two other facts to support its finding that Humphrey's payments were outside the ordinary course. The court noted that the Bank accepted unprecedentedly large payments from Humphrey despite its knowledge that the agricultural equipment sales market was doing poorly. The court also noted that the Bank had classified Humphrey's loans as problematic and had set up a special reserve to secure Humphrey's loans, but did not inquire about the source of the funds Humphrey was using to pay it. But this was not enough to support an inference of recklessness. The Bank may have known about Case's security interest, but as we have seen that does not necessarily mean the Bank knew Humphrey's payments violated that interest. There was no evidence to indicate that the Bank knew, or even suspected, that Humphrey was not fulfilling his obligations to Case.

As for the other factors the court cited, the classification of Humphrey's loans was at the FDIC's behest and was viewed by the Bank as fairly routine. We agree with the district court's conclusion in its opinion granting summary judgment against Case on its criminal conversion claim that "[t]he substandard classification by the Comptroller and the resulting actions taken by the Bank thus did not put the Bank on notice or show that the Bank was aware that [Humphrey] was not meeting its obligations to [Case]." Nor is there any reason to think that the downturn in the agricultural equipment business would have led the Bank to suspect that Humphrey's payments violated Case's security interest. In fact, if agricultural equipment sales were slow, and Humphrey was not selling much Case equipment, it would have been reasonable for the Bank to presume that Humphrey was receiving his money from a source other than the proceeds of the sale of Case equipment. Moreover, Humphrey was able to avoid paying Case by keeping "undelivered" Case equipment on Hardy's lot to prevent Case from discovering that the equipment had been sold. If Humphrey was able to trick Case, there is no reason to think that the Bank should have suspected that Humphrey was selling Case equipment and using the proceeds to pay the Bank. After all, the Bank was in no better position and had less incentive than Case to monitor sales of Case equipment.

Aside from this, there was no evidence of any improper motive by Humphrey or any unusual agreements between Humphrey and the Bank concerning his loans. Nor was there any evidence that Bank officials took any unusual steps to exact early payment. In fact, while the Bank was accepting sizeable payments, it was also making sizeable advancements to Humphrey. Between December 28, 1987 and late April 1988, the Bank advanced over $388,000 in new credit. Humphrey's obligation to the Bank was only marginally reduced, from $672,000 to $606,000, which dispels any claim that the Bank was taking advantage of other creditors to siphon money from a dying business. All this also cuts against any finding of recklessness.

In short, the record in this case would not support a finding that the Bank received payments from Humphrey in reckless disregard of the fact that those payments violated Case's security interest. The district court itself found that the Bank had no actual knowledge that the

payments violated Case's security agreements. Thus, since Humphrey made his payments in the operation of his business, those payments were made in the ordinary course of business and Case is not entitled to recover them.[1]

### IV.

For the reasons set forth, the district court's judgment is

REVERSED.

---

**1.** Since we have found that Humphrey's payments were made in the ordinary course of business, we need not decide the argument of the Bank and the *amicus curiae,* Indiana Bankers Association, that the district court erred by analyzing the payments under Ind.Code § 26–1–3–302, the provision dealing with holders in due course of negotiable instruments. The parties and *amicus* agree that there is no need to turn to § 3–302 if the payments are found to be within the ordinary course. Whether § 3–302 is ever relevant in a situation in which a debtor pays funds out of a commingled account to a third party is another question we need not consider.