2007 UT App 209

**VOLVO COMMERCIAL FINANCE, L.L.C. THE AMERICAS, a Delaware limited liability company, Plaintiff and Appellant,**

v.

**WELLS FARGO BANK, N.A., a national banking association, Defendant and Appellee.**

No. 20051127–CA.

Court of Appeals of Utah.

June 21, 2007.

Rehearing Denied Aug. 13, 2007.

Thomas R. Karrenberg, Stephen P. Horvat, and Heather M. Sneddon, Salt Lake City, for Appellant.

James S. Jardine, Scott H. Clark, and Elaine A. Monson, Salt Lake City, for Appellee.

Before Judges BENCH, McHUGH, and THORNE.

OPINION (For Official Publication)

BENCH, Presiding Judge:

¶ 1 In a dispute arising from the competing interests in cash proceeds that were deposited into a bank account by Great Basin Company, Inc. (Debtor), Plaintiff Volvo Commercial Finance, L.L.C. The Americas (Volvo) appeals the summary judgment granted in favor of Defendant Wells Fargo Bank (Wells Fargo). We reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2 Debtor was the parent company of several vehicle dealerships engaged in the business of selling multiple brands of trucks and trailers, including Volvo trucks. Volvo financed Debtor's purchase of Volvo brand trucks and obtained, as collateral, a security interest in the trucks and in the proceeds resulting from Debtor's sale of the trucks. There is no dispute as to the validity of Volvo's security interest or the corresponding financing statement. Debtor's complex business operations can be simplified for our purposes by noting that Debtor set up a system through Wells Fargo by which each dealership made daily deposits, including proceeds from the sale of Volvo trucks, into separate Wells Fargo bank accounts. The funds in these accounts were then automatically swept into a Wells Fargo concentration account (the Concentration Account). Debtor's operating costs seem to have been largely paid out of funds in the Concentration Account, be it to third-parties directly or to individual dealerships so that payment could be made on a local level.

¶ 3 In the fall of 2000, Debtor began to experience financial difficulties and fell behind in its payments to Volvo and other creditors. In December 2000, after notifying Debtor that it was in default of the parties' security agreement, Volvo directed the purchasers of Volvo trucks who had outstanding accounts with Debtor to pay all funds owed to Debtor directly to Volvo. On December 21 and 22, Debtor transferred a total of $2,000,000 from the Concentration Account into Debtor's newly opened bank account with First Security Bank (the First Security

Account).[1] The remaining funds in the Concentration Account were dissipated over the next few days.

¶ 4 On the morning of December 28, 2000, Wells Fargo contacted Debtor and informed the appropriate representative that if Wells Fargo were to honor all the checks presented for payment against the Concentration Account on December 27, the Concentration Account would be overdrawn in the amount of $790,160.73. Based on Debtor's oral assurances that sufficient funds would be wired into the Concentration Account, Wells Fargo honored and processed the December 27 checks. On December 29, Wells Fargo received similar assurances that Debtor would wire sufficient funds into the Concentration Account to cover approximately $39,000 in checks that were presented for payment against the Concentration Account on December 28. Wells Fargo honored the December 28 checks based on Debtor's oral assurances, bringing the overdrawn amount to a total of $828,951.36. Later that day, Debtor wire transferred $900,000 from the First Security Account into the Concentration Account. Wells Fargo automatically subtracted the existing negative balance of $828,951.36, leaving just $71,048.64 in the Concentration Account.

¶ 5 Debtor soon thereafter filed for bankruptcy. Volvo filed suit against Wells Fargo claiming that $693,000 of Debtor's $900,000 wire transfer were identifiable proceeds covered by Volvo's security interest in the collateral trucks and that Wells Fargo's interest in those funds was subordinate to Volvo's. The trial court granted summary judgment in favor of Wells Fargo, and Volvo appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 6 Volvo appeals the trial court's grant of summary judgment in favor of Wells Fargo. Summary judgment is appropriate only if it can be shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Therefore, when we review the district court's decision

to grant summary judgment, we review the court's legal decisions for correctness, giving no deference, and review 'the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.'" J.R. Simplot Co. v. Sales King Int'l, 2000 UT 92, ¶ 13, 17 P.3d 1100 (quoting Dairy Prod. Servs., Inc. v. Wellsville, 2000 UT 81, ¶ 15, 13 P.3d 581).

## ANALYSIS

### I. The Lowest Intermediate Balance Rule (LIBR)

¶ 7 Volvo claims that the trial court erroneously ruled that, as a matter of law, the $2,000,000 sum Debtor transferred out of the Concentration Account and into the First Security Account was not identifiable as the cash proceeds resulting from the sale of Volvo trucks. In granting summary judgment, the trial court specifically ruled that the funds transferred out of the Concentration Account could not be legally traced by Volvo based on the application of LIBR, a rule from the law of trusts that governs the tracing of funds out of a commingled account like the Concentration Account. LIBR, which is often employed by courts in the context of bankruptcy cases, states that "any funds removed from a commingled account are presumed to be the [d]ebtor's funds to the extent the funds exceed the beneficiary's equitable interest." In re JD Servs., Inc., 284 B.R. 292, 298 (Bankr.D.Utah 2002). Also, "[i]f the [t]rustee deposits other funds into the commingled account, it is generally held that the [t]rustee is not replenishing trust funds." Id.

¶ 8 Courts have held that LIBR's first presumption, that the first funds withdrawn from a commingled account belong to the trustee, "is a mere presumption, which will not stand against evidence to the contrary." Brennan v. Tillinghast, 201 F. 609, 614 (6th Cir.1913). Specifically,

this rule of presumption has no application where the evidence shows that the first

1. Although not critical to our analysis here, we note that Wells Fargo purchased First Security Corporation in 2000 and that the merger of the two companies was ongoing during the pertinent events of this case.

moneys drawn out of the mingled fund by the tort-feasor were not in fact dissipated by him at all, but were merely transferred, in a substituted form, to another fund retained in his own possession. In such case, it must be held that the trust attaches to the substituted form in which the property is retained by the tort-feasor, and that the right to follow the trust in such form is not lost by reason [of] the fact that the tort-feasor thereafter draws out and spends for his own purposes the balance of the fund in which the trust money was originally mingled.

*Id.* Further, courts have held that LIBR "is an equitable fiction that should not be employed where equity does not warrant the result." *In re Foster,* 275 F.3d 924, 927 (10th Cir.2001).

■ ¶ 9 Here, neither party denies Volvo's perfected security interest in some portion of the funds contained in the Concentration Account, nor is there a dispute that Debtor was acting as a trustee over the cash proceeds deposited in the Concentration Account. The record shows that Debtor transferred $2,000,000 out of the Concentration Account and did not dissipate the transferred money, retaining possession of the funds in the First Security Account. The mere transfer of funds into a new account still in the trustee's possession does not, as a matter of law, preclude a creditor's ability to trace those funds into the new account. When a trustee has retained funds transferred out of a commingled account, be it in a new account or in some other identifiable form, the retention presents circumstances to which the first presumption of LIBR cannot apply. To apply LIBR as the trial court did here would create a loophole in the law by which a debtor could easily circumvent a secured-party creditor's claim on cash proceeds. We therefore hold that the LIBR presumption, that the first funds drawn from a commingled account belong to the trustee or debtor, does not apply in this case. The trial court's grant of summary judgment based on this

presumption was in error, and we remand the case to the trial court for further proceedings.

¶ 10 Because we remand this case, we need not reach Wells Fargo's other issues presented on appeal, especially since the trial court has yet to address them. "However, in the interest of judicial economy, 'a brief discussion of these issues is appropriate as guidance for the trial court on remand.'" *Armed Forces Ins. Exch. v. Harrison,* 2003 UT 14, ¶ 38, 70 P.3d 35 (quoting *Kilpatrick v. Wiley, Rein & Fielding,* 2001 UT 107, ¶ 55, 37 P.3d 1130).

## II. Application of Revised Article 9 [2]

¶ 11 Wells Fargo claims that the savings clause of Revised Article 9 brings the transactions in this case under the jurisdiction of Revised Article 9 even though they occurred prior to July 1, 2001, the date the new version became effective. *See* Utah Code Ann. § 70A–9a–701(1) (2001). The savings clause states that "[e]xcept as otherwise provided in this part, this act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect." Utah Code Ann. § 70A–9a–702(1) (2001). The exceptions to the savings clause can be found in sections 70A–9a–703 through 709. *See id.* § 70A–9a–702(2). Section 709(1) reads: "This act determines the priority of conflicting claims to collateral. However, if the relative priorities of the claims were established before this act takes effect, former [Article] 9 determines priority." Utah Code Ann. § 70A–9a–709(1) (2001).

■ ¶ 12 The Official Comment to the Uniform Commercial Code (U.C.C.) Revised Article 9 section 709 states that "the mere taking effect of this Article does not of itself adversely affect the priority of conflicting claims to collateral." U.C.C. § 9–709 official cmt. 1 (2001); *see also J.R. Simplot Co. v. Sales King Int'l,* 2000 UT 92, ¶ 40, 17 P.3d 1100 (holding that the official comments to

---

**2.** On July 1, 2001, Utah's adoption of the revisions to Article 9 of the Uniform Commercial Code, which governs Secured Transactions, became effective. *See* Utah Code Ann. § 70A–9a–701(1) (2001). In discussing Wells Fargo's argument that the revised version of the statute should govern this case, we refer to Utah's pre-revision and post-revision versions of the statute as Former Article 9 and Revised Article 9 respectively.

the U.C.C. are persuasive authority in Utah). Though Utah courts have not considered the issue of when parties' relative priorities are established for purposes of applying the savings clause, other jurisdictions have held that priorities are established on the date when both parties have obtained an interest in the collateral. *See In re New Haven Foundry, Inc.*, 285 B.R. 646, 649 (Bankr.E.D.Mich. 2002) (holding that when the interest of one party was created in 1999 and that of the other in April 2001, Former Article 9 applied to the transaction); *Metzger v. Americredit Fin. Servs., Inc.*, 273 Ga.App. 453, 615 S.E.2d 120, 124 (2005) (holding that Revised Article 9 governed the dispute between a holder of a pre–2001 security interest in a vehicle and a 2002 purchaser of the same vehicle).

¶ 13 Here, there is no dispute that Volvo's security interest in the collateral was perfected prior to the December 2000 transactions at issue. Wells Fargo's interest in the funds covered by Volvo's security interest was established, at the latest, when Debtor wire transferred the $900,000 into the Concentration Account on December 29, 2000. We therefore conclude that the relative priorities of the parties in this case were established prior to the effective date of Revised Article 9 and that Former Article 9 will govern on remand.

### III. Affirmative Defenses

¶ 14 Both parties urge this court to address their arguments concerning potential defenses that the trial court did not address below. These arguments center largely around two factual questions and are to be analyzed under Former Article 9. Was Wells Fargo's seizure of the funds wire transferred into the Concentration Account on December 29 a set-off? And, if Wells Fargo's seizure was not a set-off, did Wells Fargo receive the funds in the ordinary course of business?

¶ 15 A set-off has been defined as "the *involuntary* taking of funds from a debtor's account." *Textron Fin. Corp. v. Firstar Bank*, 217 Wis.2d 582, 579 N.W.2d 48, 52 (App.1998) (emphasis added). The majority of jurisdictions, including Utah, hold that a bank's right to a set-off is subordinate to that of a secured party's right to proceeds

deposited in the bank account. *See Insley Mfg. Corp. v. Draper Bank & Trust*, 717 P.2d 1341, 1346–47 (Utah 1986); *see also Security State Bank v. Firstar Bank*, 965 F.Supp. 1237, 1247 (N.D.Iowa 1997) (holding that a "bank may not loan money to [a debtor] by paying [a debtor's] overdrafts and then expect to jump over [another secured party's] priority in the identifiable proceeds" by virtue of a set-off (quotations and citation omitted) ).

¶ 16 If Wells Fargo's seizure of the funds was not a set-off, the trial court must then decide whether Wells Fargo received the funds in the ordinary course of business. Wells Fargo argues that the pre-revised U.C.C. section 9–306, on which the corresponding section of Former Article 9 is based, would allow Wells Fargo to take the funds free of Volvo's security interest. The official comments to the U.C.C. are persuasive, but not controlling, authority. *See J.R. Simplot Co.*, 2000 UT 92 at ¶ 40, 17 P.3d 1100. Comment 2(c) provides as follows:

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in [the] ordinary course.

U.C.C. § 9–306 cmt. 2(c) (amend.1972), 3B U.L.A. 40 (2002). "Comment 2(c) provides that recipients take free of a senior security interest only if the cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business." *J.R. Simplot Co.*, 2000 UT 92 at ¶ 41, 17 P.3d 1100. "This presupposes an account over which the debtor exercises control, into which the debtor voluntarily makes deposits, and from which the debtor voluntarily makes payments to third parties who take in good faith." *Id.* (quotations and citation omitted).

¶ 17 The Seventh Circuit for the United States Court of Appeals has provided helpful instruction about what constitutes a payment or transfer in the ordinary course: "a payment is within the ordinary course if it was made in the operation of the debtor's

business and if the payee did not know and was not reckless about whether the payment violated a third party's security interest." *J.I. Case Credit Corp. v. First Nat'l Bank,* 991 F.2d 1272, 1279 (7th Cir.1993). Further, the Seventh Circuit stated that "the most important factor to consider is the payee's knowledge about whether the payment was made with money that rightfully belongs to another." *Id.* at 1277. Therefore, a payment is made in the ordinary course when it is made to a payee who had no knowledge and was not reckless about knowing whether "the payment violated a third party's security interest." *Textron Fin. Corp.,* 579 N.W.2d at 51–52.

¶ 18 The trial court has yet to consider these factual issues regarding the nature of Wells Fargo's seizure and the status of Wells Fargo as a payee in the ordinary course of Debtor's business. We therefore remand these issues to the trial court.

## CONCLUSION

¶ 19 LIBR presumes that the first funds withdrawn from a commingled account are the personal funds of the trustee. That presumption, however, is not applicable when the withdrawn funds remain under the control of the trustee. In the instant case, the record shows that Debtor retained control over the transferred funds, so the presumptions of LIBR are inapplicable. The trial court therefore erred in ruling that Volvo could not, as a matter of law, trace the cash proceeds out of the Concentration Account. Former Article 9 will govern this case on remand because the parties established the relative priorities of their competing interests prior to the effective date of Revised Article 9. The trial court will need to decide whether the bank's seizure was in fact a set-off and, if not a set-off, whether Wells Fargo knew or was reckless in not knowing that the funds it seized were subject to Volvo's security interest.

¶ 20 For the foregoing reasons, we reverse the summary judgment and remand the case for further proceedings.

¶ 21 WE CONCUR: CAROLYN B. McHUGH and WILLIAM A. THORNE JR., Judges.