**MID–STATES SALES COMPANY, INC., Plaintiff-Appellant and Cross-Appellee,**

v.

**MOUNTAIN EMPIRE DAIRYMEN'S AS-SOCIATION, INC., Defendant-Appellee and Cross-Appellant.**

No. 85CA1261.

Colorado Court of Appeals, Div. III.

June 18, 1987.

Hellerstein, Hellerstein and Shore, P.C., Christian Carl Onsager, Gwen S. Anderson, Robert E. Markel, Denver, for plaintiff-appellant and cross-appellee.

Holme Roberts & Owen, Stephen E. Snyder, Nancy J. Gegenheimer, Denver, for defendant-appellee and cross-appellant.

STERNBERG, Judge.

Ronald L. Lewis, a dairyman, was a member of the Mountain Empire Dairymen's Association (MEDA), the defendant. MEDA was Lewis' exclusive agent for marketing dairy products. Mid-States Sales Co., Inc. (Mid-States), the plaintiff, is a secured creditor of Lewis who sued MEDA for allegedly disposing of Lewis' milk proceeds in a manner contrary to Mid-States' security rights in those proceeds.

The trial court concluded that, even though Mid-States had not waived its security interest in Lewis' milk proceeds, MEDA was not liable for converting either of two disputed amounts. Both parties have appealed the judgment. We reverse the judgment and hold that MEDA is liable to Mid-States for converting a portion of the milk proceeds it offset in payment for a milk storage tank it sold Lewis. We also hold that MEDA is liable to Mid-States for the amount it distributed directly to Lewis in December 1981. That amount should have been paid to Mid-States under assignments which had been neither terminated nor released when the amount was paid out to Lewis.

### I. Factual Background

In June 1980, Lewis executed two installment sales notes, payable to Mid-States, in the amounts of $164,178 and $30,672. He also executed security agreements, duly perfected by Mid-States, granting Mid-States a security interest in specified cattle, as well as their increase, products, and proceeds. By the printed form security agreement, Lewis also agreed not to sell this property without permission of Mid-States.

Pursuant to a preexisting membership agreement with MEDA, MEDA was Lewis' exclusive agent for marketing milk and dairy products. MEDA subtracted its marketing costs from Lewis' milk proceeds each month and then distributed the proceeds to Lewis' assignees during the following month. Any proceeds remaining after the assignees had been paid were given to Lewis.

In August 1980, Lewis executed two assignments authorizing MEDA to pay Mid-States $3,909 and $852 each month, corresponding to the payments due on the two installment sales notes, out of any amount

due Lewis for marketing his milk. These assignments authorize MEDA to "first ... pay any and all expenses of marketing [Lewis'] milk before [Lewis] is entitled to receive any proceeds whatsoever." The assignments also state that Lewis has no authority to cancel the assignments but that Mid-States may cancel them upon notice in writing to MEDA.

MEDA sent Mid-States a form acknowledgement of these assignments, and Mid-States accepted payments under the assignments from August 1980 until October 1981. MEDA's usual practice was to pay out the assignments to Mid-States and other creditors of Lewis in the chronological order in which the assignments had been received. Mid-States' assignments were fourth and fifth on MEDA's list.

On September 24, 1981, MEDA sold Lewis a milk holding tank for $15,293.34. It is a policy of the MEDA Board of Directors that all merchandise purchases from MEDA are to be paid for in cash at the time of sale or deducted from the member's next milk check.

In October 1981, Lewis notified MEDA that, as of November 1, 1981, he would no longer be a member of MEDA. MEDA sent Mid-States and the other assignees the amounts due out of Lewis' milk proceeds for September. Mid-States received its payment on October 23. On October 31, 1981, pursuant to its rules regarding merchandise purchases, MEDA deducted the $14,883.12 still due on the milk tank from Lewis' October milk proceeds. After that deduction, the remaining October proceeds were insufficient to cover even the first two assignments. Mid-States characterizes this deduction by MEDA (the October offset) as a unilateral offset by an unsecured junior creditor, and claims that MEDA converted the portion of these milk proceeds corresponding to the percentage of Lewis' cows covered by security agreements with Mid-States. We hold, as discussed in Part II, that MEDA's deduction was improper.

In November 1981, MEDA notified Mid-States and other assignees of Lewis that because Lewis had terminated his membership it was necessary to have them sign a release of assignment included in the notice. Mid-States did not return the release form or otherwise consent to release of the assignment. However, the record reveals that the other assignees who were paid each month by MEDA before Mid-States did sign releases. On November 10, 1981, Mid-States received notice that a feedlot had repossessed all of Lewis' cows. Deeming itself insecure, Mid-States repossessed its cows from the feedlot, sold them, and applied the proceeds to Lewis' account.

On December 18, 1981, MEDA distributed $2,753.69, representing Lewis' November milk proceeds minus MEDA's costs and an under-production penalty, directly to Lewis. Mid-States claims that MEDA converted this amount (the December direct payment) by distributing it directly to Lewis even though Mid-States had not released its assignment. As discussed in Part III, we agree with this contention.

## II. The October Offset

■ As a preliminary matter we hold that, contrary to MEDA's contentions, Mid-States satisfied its burden of establishing that, at the time of MEDA's offset, 52.5% of Lewis' milk account was identifiable proceeds of Mid-States' collateral. Mid-States' vice president testified that representatives of the feedlot that repossessed Lewis' cattle informed him that they had picked up "all" of Lewis' cattle. The record contains undisputed evidence that 42 out of a total of 80 cows repossessed by the feedlot were covered by Mid-States' security agreement with Lewis. Mid-States' vice president also indicated in his testimony that the non-producing calves were inspected separately. As there is no contrary evidence in the record, we conclude that Mid-States satisfied its burden of establishing that 42/80 or 52.5% of Lewis' milk account at that time was attributable to cows covered by Mid-States' security agreement and was therefore identifiable proceeds of Mid-States' collateral. *See* § 4–9–315(1)(a), C.R.S. (1986 Cum.Supp.) (perfected security interest continues in goods which become part of a mass in which their identity is lost).

■ Mid-States is claiming rights to the October proceeds offset by MEDA under

its security interest, duly perfected under the provisions of Article Nine of the Uniform Commercial Code, § 4-9-101, et seq., C.R.S., and not under the assignments. This distinction is significant because Mid-States has no right to these proceeds under the assignments. The assignments are of amounts "due Lewis," and after MEDA offset the balance due on the milk tank out of the October proceeds, there remained insufficient funds "due Lewis" to honor Mid-States' assignments. Further, under § 4-9-318(1)(a), C.R.S., Mid-States' rights as an assignee are subject to claims arising from the membership agreement between Lewis and MEDA. This would include MEDA's claim to a setoff under its policy regarding equipment purchases. *See Farmers Acceptance Corp. v. DeLozier Construction Co.,* 178 Colo. 291, 496 P.2d 1016 (1972).

Mid-States' rights to the milk proceeds listed as collateral under its perfected security agreement are separate and distinct from its rights under the assignments executed by Lewis, and its secured interest in those proceeds would appear to extend to the funds offset by MEDA. However, MEDA argues that Mid-States waived its security interest in these proceeds by consenting to distribution of Lewis' milk proceeds to other creditors and to Lewis himself.

Section 4-9-306(2), C.R.S. (1986 Cum. Supp.) effects a waiver of a secured party's interest in collateral if the secured party has authorized disposition of the collateral. It provides:

"[A] security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise....*" (emphasis added)

The security agreement between Mid-States and Lewis did not give Lewis or anyone else authority to dispose of collateral. Thus, the issue is whether such authorization may be implied from the circumstances of the parties, the nature of the collateral, the course of dealing of the parties, and the usage of trade. *See*

§ 4-9-306, C.R.S. (Official Comment 3); *Platte Valley Bank v. B & J Construction,* 44 Colo.App. 21, 606 P.2d 455 (1980). Because the security agreement does not require written permission to sell collateral, a finding of implied authorization from a course of dealing between Mid-States and Lewis could reasonably be construed as consistent with the express terms of the security agreement. *See* § 4-1-205(4), C.R.S. And, it makes no difference under Colorado law that MEDA rather than the debtor (Lewis) disposed of the collateral. The General Assembly has removed the specification in § 4-9-306(2) of disposition "by the debtor." Colo.Sess.Laws 1977, ch. 62 at 324. *Cf. National Acceptance Co. v. Virginia State Bank,* 491 F.Supp. 1269 (E.D.Va.1980).

The collateral that concerns us here is the proceeds from the sale of Lewis' milk, not the milk itself. When dairy cattle are used as collateral, it may reasonably be inferred that the secured party expects and wants the milk to be sold. Such sales are presumably necessary to payment on the line of credit extended, and should not result in waiver of a secured interest in proceeds of the milk sales. *See Moffat County State Bank v. Producers Livestock Marketing Ass'n,* 598 F.Supp. 1562 (D.Colo.1984), *quoting First National Bank & Trust Co. v. Iowa Beef Processors, Inc.,* 626 F.2d 764 (10th Cir.1980) (regarding the reality of cattle financing arrangements) and § 4-9-306 (Official Comment 3) (secured party may retain right to proceeds even though transferee of collateral takes free of security interest). *See also* 7 U.S.C. § 1631 (Supp.1986) (regarding protection for purchasers of farm products).

Thus, we agree with the trial court's finding that Mid-States did not waive its security interest in the milk proceeds by authorizing sales of milk. The facts do demonstrate, however, that Mid-States allowed MEDA to dispose of Lewis' milk proceeds each month to offset its marketing expenses and to pay Lewis' other assignees. By this course of dealing, we conclude that, under § 4-9-306(2), Mid-States waived its security interest in pro-

ceeds which MEDA customarily disposed of in this manner. Any remaining proceeds which were distributed to Lewis, and then paid out by Lewis in the ordinary course of his business, also would be free of Mid-States' security interest. *See* § 4–9–306 (Official Comment 2(c)).

However, there is insufficient evidence to support an implication that Mid-States authorized MEDA to offset amounts due on equipment purchases before honoring Lewis' assignments. Mid-States did consent to receiving payments under assignments of amounts "due Lewis." But, in contrast to an earlier form of assignment used by MEDA which specifically acknowledges MEDA's right to offset amounts due for equipment purchases, the assignments executed in favor of Mid-States acknowledge only MEDA's right to deduct "any and all expenses of marketing [Lewis'] milk." Nor is there any evidence in the record that Mid-States actually consented to an equipment purchase offset on any previous occasion.

The trial court found that MEDA was entitled to pay itself the $14,883.12 it was owed by Lewis for the milk tank because Mid-States had already received its October payment and Lewis therefore was not in default. However, the record reveals that Mid-States had *not* actually received its "October payment." The payment received by Mid-States on October 23 was for milk sold in *September.* At the time of MEDA's offset, October 31, 1981, MEDA had accumulated enough proceeds from *October* milk sales to make the offset possible. MEDA's records show that, instead of subtracting its marketing costs and distributing the October proceeds to the assignees in November in accordance with the usual course of dealing, MEDA subtracted its costs and then paid itself for the tank. This did not leave sufficient funds remaining to honor Mid-States' assignments. Thus, even if Lewis was not in default on the date of offset, the offset itself would have caused a default when the November payment came due (November 22, 1981), had the feedlot repossession not triggered default twelve days earlier.

Further, while it is true that a secured creditor may not enforce its interest in collateral until the debtor defaults, a secured party's rights against conflicting claims to the collateral are not determined by the debtor's default, but by the creditor's compliance with the provisions of Article 9 of the Uniform Commercial Code governing the attachment and perfection of security interests and the priority of conflicting interests. *National Acceptance Co. v. Virginia Capital Bank, supra.*

Therefore, we conclude that the trial court erred in its conclusion that MEDA did not convert the $14,883.12 in milk proceeds which it offset in payment for the tank and refused to pay Mid-States. However, in the usual course of dealing, Mid-States would only have received the sum of $4,761 ($3,909 plus $852) out of the October proceeds. All of the remaining proceeds (except $.92) would have been distributed to other creditors, with Mid-States' implied consent. We hold, therefore, that Mid-States' security interest continued, but only in those proceeds which it had not, by a course of dealing, authorized to be distributed to other creditors. Of the $7,813.64 representing 52.5% of MEDA's offset, Mid-States' recovery must therefore be limited to $4,761.

This result appears to us to distribute the risk appropriately as a matter of policy. MEDA was Lewis' exclusive marketing agent and was in as good a position as Mid-States, if not a far better one, to determine the credit risk of selling Lewis the milk tank.

III. The December Direct Payment

The assignments executed by Lewis were of "any amount" due him for milk marketed through MEDA. Thus, unlike Mid-States' rights under the security agreement, its rights under the assignments are not limited to proceeds resulting from cows covered by the security agreement. It is therefore irrelevant to Mid-States' rights under the assignments, even if true, that after November 10 Lewis no longer possessed cows in which Mid-States had a security interest. Since Lewis' November proceeds were only approximately fourteen

percent of his usual monthly sales, and there is no evidence that Lewis acquired new cows in November, these November proceeds were in fact attributable to the cows repossessed on November 10.

The trial court held that Lewis' termination of his membership agreement with MEDA terminated MEDA's obligations under the assignments. We disagree, and hold that MEDA was obligated to pay Mid-States the $2,753.69 collected from Lewis' November milk sales even if Lewis had terminated his membership.

The assignments executed by Lewis specifically state that Lewis did not have the authority to cancel them. Thus, Lewis could not do so by terminating his membership agreement with MEDA. Further, undisputed evidence shows that MEDA continued to act as Lewis' agent during November, collecting and disbursing to Lewis the amount in question.

As long as the agency relationship between Lewis and MEDA existed, or as long as MEDA owed Lewis proceeds of milk marketed through MEDA Mid-States' rights under the assignments remained in full effect. After notice of a valid assignment, payment to the assignor or any person other than the assignee is at the debtor's peril and does not discharge him from liability to the assignee. 6A C.J.S. *Assignments* § 87(b). *See also* § 4–9–318(3),

C.R.S. (1986 Cum.Supp.); *Kitzinger v. Beck,* 4 Colo.App. 206, 35 P. 278 (1894).

Since the defendant's own exhibits show that other assignees of Lewis who were normally paid before Mid-States had released their assignments in accordance with the form sent out by MEDA, there is no merit to MEDA's argument that there would not have been any money left over for Mid-States after paying the other assignees. And, because MEDA did not claim an offset against Lewis' November milk proceeds, Mid-States' rights to those proceeds under the assignments are not subject to such a claim. *See* § 4–9–318(1)(a), C.R.S.

The judgment is reversed, and the cause is remanded for entry of judgment in the amount of $4,761 on the October offset, $2,753.69 on the December direct payment, plus interest at the legal rate from the dates of conversion.

VAN CISE and SILVERSTEIN *, JJ., concur.

---

* Sitting by assignment of the Chief Justice under provisions of the *Colo. Const.,* art. VI, Sec. 5(3),

and § 24–51–607(5), C.R.S. (1982 Repl.Vol. 10).