**HCC CREDIT CORPORATION, f/k/a Hesston Credit Corp., Appellant (Plaintiff below),**

v.

**SPRINGS VALLEY BANK & TRUST, Appellee (Defendant below).**

No. 59S04–9703–CV–222.

Supreme Court of Indiana.

May 17, 1999.

security interest in both the tractors and the proceeds from their sale. Because we hold that the payment to the bank was not in the ordinary course of the operation of Lindsey's business, HCC is entitled to recover the $199,122.

### Background

Lindsey Tractor Sales, Inc., purchased wholesale farm equipment from Hesston Corporation for resale in Lindsey's French Lick farm machinery sales and service business. At the times relevant to this case, HCC Credit Corporation provided financing for the purchases.

Written contracts governed the relationship between Hesston and HCC and Lindsey, including a security agreement. In the security agreement, Lindsey granted HCC a security interest in all the equipment it purchased from Hesston and in the proceeds from the sale of the equipment. Lindsey also agreed to pay HCC immediately for equipment sold from the proceeds of the sale. However, at no time did Hesston or HCC require Lindsey to deposit or segregate proceeds from the sale of Hesston products in a separate account.

The parties agree and the trial court found that the security agreement was binding and enforceable against Lindsey, that Lindsey understood the purpose and effect of the security agreement (including the requirement of paying for equipment immediately when sold), and that HCC had a valid and perfected security interest in the equipment and proceeds from the sale thereof.

In 1991, the Indiana State Department of Transportation agreed to purchase from Lindsey 14 Hesston tractors. Lindsey acquired the tractors from Hesston on credit provided by, and subject to the security agreement in favor of, HCC. Lindsey received payment from the State on August 15, 1991, and deposited the proceeds of $199,122 in the company's checking account at Springs Valley Bank & Trust. At the time of the deposit, Lindsey had $22,870 in other monies on deposit in the account. On the next day, August 16, 1991, Lindsey wrote a check on this account payable to the bank for $212,-104.75.

Lindsey's payment to the bank of the proceeds from the sale of the tractors was ap-

Garrett B. Hannegan, Morgan & Pottinger, P.S.C., New Albany, Indiana, Attorneys for Appellant.

James C. Tucker, Tucker and Tucker, Paoli, Indiana, Attorneys for Appellee.

SULLIVAN, Justice.

Lindsey Tractor Sales, Inc., sold 14 tractors to a customer and used the $199,122 proceeds to pay off the debt it owed Springs Valley Bank & Trust. Yet HCC Credit Corporation had financed Lindsey's purchase of the tractors and held a valid and perfected

plied to pay debts owed by Lindsey to the bank. These debts were evidenced by four promissory notes dated January 23, 1987, November 19, 1990, February 7, 1991, and February 13, 1991. All four represented previously refinanced debts and three of them were not yet due when they were paid on August 16. The bank and Lindsey did not discuss paying off the four notes with Lindsey prior to their payment, nor did the bank seize the account to pay the notes. More specifically, Lindsey did not tell anyone associated with the bank that $199,122 of the $212,104.75 used to pay off the notes was from the sale of Hesston products. On the other hand, during the previous eight years Lindsey had borrowed funds or refinanced debts in excess of 100 times with the bank. The average debt balance outstanding during that period was between $100,000 and $200,-000. After the notes were paid with the proceeds from the sale of the tractors, Lindsey owed the bank between $2,000 and $15,-000.

Lindsey filed a bankruptcy liquidation proceeding in December of 1991, and dissolved shortly thereafter.

In the trial court, HCC sought to recover the $199,122 in proceeds from the sale of Hesston tractors that the bank received from Lindsey. Each party moved for summary judgment, agreeing that there were no genuine issues of material fact. The trial court granted summary judgment in favor of the bank and the Court of Appeals affirmed. *HCC Credit Corp. v. Springs Valley Bank & Trust,* 669 N.E.2d 1001 (Ind.Ct.App.1996).

### Discussion

#### I

Under both the terms of the security agreement between the parties and the provisions of Article 9 of the Uniform Commercial Code as adopted by our legislature, HCC had a valid and perfected security interest in

the $199,122 proceeds from the sale of the tractors. *See* Ind.Code § 26-1-9-306(2) ("a security interest continues ... in any identifiable proceeds including collections received by the debtor"). If this were the end of the matter, there is no question but that HCC would be entitled to the money: U.C.C. Article 9 gives the "secured party, upon a debtor's default priority over 'anyone, anywhere, anyhow' except as otherwise provided by the remaining [U.C.C.] priority rules." *Citizens Nat'l Bank of Whitley County v. Mid–States Dev. Co.,* 177 Ind.App. 548, 557, 380 N.E.2d 1243, 1248 (1978) (citing Ind.Code § 26-1-9-201; other citations omitted).

But in promulgating the 1972 version of Article 9 of the Uniform Commercial Code, the National Conference of Commissioners on Uniform State Laws (NCCUSL) appended the following "official comment":

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. *What has been said relates to payments and transfers in the ordinary course.* The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from the transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

U.C.C. § 9-306 cmt. 2(c) (1972), 3 U.L.A. 441 (1981) (emphasis supplied). We will refer to this official comment in this opinion as "Comment 2(c)."

■ Although our legislature has never adopted the NCCUSL comments as authoritative,[1] there seems to be general agreement that, at least to some extent, Comment 2(c) is an exception to the Indiana U.C.C.'s general priority rules.[2] The bank argues that in this

---

1. *Compare* Ind.Code § 23-1-17-5 (providing that official commentary to the Indiana Business Corporation Law "may be consulted by the courts to determine the underlying reasons, purposes, and policies of [the BCL] and may be used as a guide in its construction and application"), *with Benham v. State,* 637 N.E.2d 133, 136 n.3 (Ind.1994) (rejecting use of commentary to proposed Indiana Penal Code in part because there was no

evidence "that it was adopted or even considered by the legislature").

2. The papers submitted by both parties in this case acknowledge this proposition. *See also J.I. Case Credit Corp. v. First Nat'l Bank of Madison County,* 991 F.2d 1272, 1276 (7th Cir.1993) ("Both the Bank and Case agree, based on language in *Citizens Nat'l Bank,* that Indiana has

case, the proceeds were paid out of Lindsey's checking account in the operation of Lindsey's business and that the payment was made in the ordinary course without any collusion with the debtor. As such, the bank contends, Comment 2(c) operates to provide that the bank received the $199,122 free of any claim which HCC had in it as proceeds.[3] The trial court and Court of Appeals adopted this rationale. HCC now seeks transfer, arguing that its perfected security interest entitles it to the proceeds.

## II

At a certain level of abstraction, this case requires us to assess the relative rights of a secured creditor to the proceeds of its collateral and of a third party to whom the debtor transfers those proceeds. Sound commercial policy considerations can be marshaled in support of both the rights of the secured party and the rights of the transferee.

### A

Commercial policy considerations supporting the rights of a secured party are well set forth by Judge Garrard in *Citizens National Bank*.[4] In that case, the debtor sold collateral in which a party held a valid and perfected security interest. When the debtor deposited the proceeds in the debtor's bank account, the bank exercised a contractual right of set-off. In weighing the bank's right to set-off against the secured party's interest in the proceeds, the court found that a secured party should be able to rely on its compliance with the U.C.C.'s requirements for perfection and its search of the public recording system as against the unrecorded interest of the setting-off bank. 177 Ind.App. at 559, 380 N.E.2d at 1249. "Were this otherwise,"

Judge Garrard wrote, "a secured party with an interest in proceeds could not rely on recording." *Id.* Instead, he reasoned, the secured party would be required to take additional steps to insure full protection such as requiring special accounts or inquiring into loan transactions which are not a matter of public record. 177 Ind.App. at 559, 380 N.E.2d at 1250. "Putting such a duty on a secured party, as well as permitting a bank to prevail if that duty is not met, undercuts significant values of certainty, efficiency and reliance which are at the heart of the [U.C.C.'s] emphasis on public filing." *Id.*

The court also noted that while it might be a safe practice for a secured party to require that proceeds be payable to it before future advances to the debtor are made, "it is purposefully not required by the [U.C.C.] for the maintenance of a proceeds security interest since it tends to curtail commercial practice and business operation." *Id.* In holding for the secured party, Judge Garrard concluded that if U.C.C. Article 9 "is to be a comprehensive system for the perfection of security interests in personal property we see no reason for requiring special standards, with their increased costs, that must be met if a secured party is to prevail over a bank's right of set-off. The [U.C.C.'s] priority rules are sufficient." *Id.*

In *Citizens National Bank,* the conflicting interests were between the creditor's perfected security interest and the bank's right to set-off. In the case before us, the conflicting interests are between HCC's perfected security interest and the bank's asserted right as ordinary course transferee.[5] As such, the result in *Citizens National Bank* does not dictate the result here. But *Citizens Na-*

---

recognized Comment 2(c) as an exception to the [Indiana U.C.C.'s] general priority rules.").

**3.** As discussed under *Background, supra,* Lindsey deposited the proceeds from the tractors' sale into the business's checking account and then used those proceeds, along with other funds in the account, to pay the bank. The commingling of the proceeds with other funds does not cut off HCC's claim. It is well settled that in appropriate circumstances, "a secured party may trace 'identifiable proceeds' through a commingled bank account and into the hands of a recipient who lacks the right to keep them." *Harley–Davidson Motor Co. v. Bank of New England–Old*

*Colony, N.A.,* 897 F.2d 611, 620 (1st Cir.1990) (collecting cases).

**4.** Judge Garrard's opinion in *Citizens National Bank* is cited by virtually every court—federal and state—that takes up the issue of entitlement to proceeds of collateral.

**5.** It is clear that the bank did not seize Lindsey's account for purposes of paying the four notes. Indeed, the trial court found that Lindsey did not consult with the bank before paying the notes and that the bank did not know that the funds it received were the proceeds of the sale of Hesston tractors or that HCC had any claim thereto.

*tional Bank* helps us understand the policy interests that favor enforcing HCC's perfected security interest—that requiring secured parties to take steps beyond those specified in Article 9 to protect their interests "undercuts significant values of certainty, efficiency" and "tends to curtail commercial practice and business operation."

## B

Just as Judge Garrard gives sound policy reasons in *Citizens National Bank* for enforcing perfected security interests, there are sound policy reasons for allowing third party transferees to retain proceeds of another's collateral. When he was a judge of the United States Court of Appeals for the First Circuit, Justice Breyer had occasion to address this subject: "If ... courts too readily impose liability upon those who receive funds from the debtor's ordinary bank account—if, for example, they define 'ordinary course' of business too narrowly—then ordinary suppliers, sellers of gas, electricity, tables, chairs, etc., might find themselves called upon to return ordinary payments ... to a debtor's secured creditor, say a financier of inventory." *Harley–Davidson Motor Co. v. Bank of New England–Old Colony, N.A.,* 897 F.2d 611, 622 (1st Cir.1990) (internal citation omitted).

Judge Breyer was also able to "imagine good commercial reasons for *not* imposing, even upon sophisticated suppliers or secondary lenders, who are aware that inventory financiers often take senior secured interests in 'all inventory plus proceeds,' the complicated burden of contacting these financiers to secure permission to take payment from a dealer's ordinary commingled bank account. These considerations," he continued, "indicate that 'ordinary course' has a fairly broad meaning; and that a court should restrict the use of tracing rules to conduct that, in the commercial context, is rather clearly improper." *Id.*[6]

*Harley–Davidson* makes a strong statement of the policy interests supporting the bank's claim to the $199,122. But it is interesting to note that despite Judge Breyer's conception of the commercial utility of a "fairly broad meaning" for "ordinary course," his court was unwilling to find that the transferee bank in the *Harley–Davidson* case was entitled to summary judgment.

## III

Judge Garrard's opinion in *Citizens National Bank* and Judge Breyer's in *Harley–Davidson* each illustrates the way the U.C.C. streamlines legal impediments to commerce: reducing the burden on perfected secured parties in the former and reducing the burden on ordinary course payees in the latter. But the drafters of the U.C.C. recognized that these two efforts could come into conflict as they do in this case. Comment 2(c) is meant to resolve that conflict.

■ Comment 2(c) is not a statute and is not written in the form of a statute; it does not set forth a tightly worded rule, followed by equally tightly worded elements necessary to establish its application. Rather, it is a narrative collection of three sentences from which we conclude that a recipient of a payment made "in the ordinary course" by a debtor takes that payment free and clear of any claim that a secured party may have in the payment as proceeds. The Comment also tells us that the payment (1) will be in the ordinary course if it was made "in the operation of the debtor's business" but (2) will not be in the ordinary course if there was "collusion with the debtor to defraud the secured party." We do not take these two factors to be the equivalent of statutory ele-

**6.** We note that in their most recent revision of Article 9, the American Law Institute and National Conference of Commissioners on Uniform State Laws have proposed that this liberal approach be codified. A new section would be added to Article 9 providing that "transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." U.C.C. § 9–329 (1998). "Broad protection for transferees helps to ensure that security interests in deposit accounts do not impair the free flow of funds. It also minimizes the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds. Rules concerning recovery of payments traditionally have placed a high value on finality. The opportunity to upset a completed transaction, or even to place a completed transaction in jeopardy by bringing suit against the transferee of funds, should be severely limited." Revision of U.C.C. Article 9, § 9–329, cmt. 3 (Reporters' Interim Draft Aug. 7, 1997).

ments but rather descriptive of two parameters for determining "ordinary course." That is, whether a payment was made in the ordinary course will be a function of (1) the extent to which the payment was made in the routine operation of the debtor's business and (2) the extent to which the recipient was aware that it was acting to the prejudice of the secured party.[7]

As to the routine operation of business parameter, payment of sales tax collections or F.I.C.A. withholdings [8] would obviously be at the most routine end and a one-shot payment of subordinated debt [9] not yet due would be at the least. At various points between these extremes would fall payments ordered by how routine they were to both debtor and transferee—measured by such factors as their size, their frequency, whether the debtor received merchandise or services in return, whether the payment was on an obligation overdue, due or not yet due,

etc. The cases have explored such payments as those for monthly marketing expenses,[10] retainers to legal counsel by companies in financial difficulty,[11] offsets against pre-existing debts,[12] and periodic term loan payments [13] in this or related bankruptcy contexts.

As to the awareness of prejudice parameter, it is hard to imagine the recipient of the monthly utility or rent payment having any knowledge that it was being paid with proceeds.[14] At the other end of the spectrum is actual fraud in which debtor and recipient have colluded against the secured party.[15] Between these poles will fall payments where the recipient knows that a security interest exists but does not know that the payment is being made in violation of that interest; payments where the recipient had sufficient notice to put a reasonable recipient, exercising prudent business practices, on notice that something was awry; and payments where

7. We explicitly reject the notion that Comment 2(c)'s "payments and transfers in the ordinary course" are the equivalent of U.C.C. § 1–201(9)'s "buyer in the ordinary course of business." Without giving extensive treatment to this point, we observe that § 1–201(9)'s definition arises in the context of "buying" which is not always applicable in Comment 2(c) disputes (including this one). See ITT Commercial Fin. Corp. v. Bank of the West, 166 F.3d 295, 306 (5th Cir.1999); Merchants Nat'l Bank & Trust Co. v. United States, 202 Ct.Cl. 343 n.3 (1973). We also note that § 1–201(9) contains a knowledge requirement on the part of the buyer which differs from that which we find required by Comment 2(c). Accord J.I. Case Credit Corp. v. First Nat'l Bank of Madison County, 991 F.2d 1272, 1278 (7th Cir. 1993); contra Bank of Oklahoma, N.A. v. Islands Marina, Ltd., 918 F.2d 1476, 1481 (10th Cir. 1990); Farmers & Merchants Nat'l Bank v. Sooner Coop., Inc., 766 P.2d 325, 330 (Okl.1988).

8. E.g., Ford Motor Credit Co. v. New York, 219 A.D.2d 202, 641 N.Y.S.2d 742, 743 (App.Div. 1996) (sales taxes); Merchants Nat'l Bank & Trust Co. v. United States, 202 Ct.Cl. 343 (1973) (F.I.C.A.).

9. Indeed, an enforceable subordination agreement would bind the parties in a contractual system of priorities outside the scope of U.C.C. Article 9. See Orix Credit Alliance, Inc. v. Sovran Bank, N.A., 4 F.3d 1262, 1269 (4th Cir.1993) (Ervin, C.J., dissenting); see also Safeco Credit Co. v. U.S. Bancorp Leasing & Fin., Inc., 833 F.Supp. 833, 835 (D.Or.1993); Anderson, Clayton & Co. v. First American Bank of Erick, 614 P.2d 1091, 1095 (Okla.1980).

10. Mid–States Sales Co. v. Mountain Empire Dairymen's Ass'n, 741 P.2d 342, 346 (Colo.Ct. App.1987).

11. In re Renfrew Center of Florida, Inc., 195 B.R. 335, 341 (Bankr.E.D.Pa.1996).

12. Les Fourrures Global Canada, Ltd. v. Lord & Taylor, Inc., Nos. 93 Civ. 6083(LMM) & 93 Civ. 6084(LMM), 1997 WL 442144, at *3 (S.D.N.Y. Aug.6, 1997).

13. E.g., Barber–Greene Co. v. National City Bank of Minneapolis, 816 F.2d 1267, 1269 (8th Cir. 1987); see also Barkley Clark, U.C.C. Survey: Secured Transactions, 43 Bus. Law. 1425, 1450 (1988) (suggesting that "a good argument could be made" for finding the periodic loan payments in Barber–Greene to be "in the ordinary course").

14. See Harley–Davidson Motor Co. v. Bank of New England–Old Colony, N.A., 897 F.2d 611, 622 (1st Cir.1990).

15. Compare Commerce Bank, N.A. v. Tifton Aluminum Co., 217 B.R. 798, 803 (W.D.Mo.1997) (Transferee knew of the secured party's interest in the proceeds and that the secured party had informed the debtor that it was not authorized to use any of the proceeds.); NCNB Texas Nat'l Bank v. Standard Iron & Steel Co., No. 88–1726–K, 1990 WL 37929 (D.Kan. Mar.16, 1990) (transferee privy to intimate knowledge of debtor's financial situation); Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317, 324 (E.D.Mo.1973) (Debtor told the transferee bank that the secured party had revoked its floor plan financing arrangement and that debtor wanted the bank to be "safe" on its loan.).

the recipient has information causing it to suspect strongly that a payment violates a secured party's interest, yet takes deliberate steps to avoid discovering more.[16]

The nature of the relationship between the debtor and the transferee can give rise to a presumption of the transferee's awareness of prejudice, especially where the transferee itself is a lender. Such a secondary lender whose debt is subordinated [17] to the secured party's or who has explicitly excluded the debtor's obligations to the secured lender in computing the debtor's borrowing base will generally be presumed to have actual knowledge of prejudice to the secured party. This occurs because the secondary lender has extended credit to the debtor with the express understanding that the secured party stands in a superior position to be repaid, at least in certain circumstances.

▮▮▮▮ We reaffirm that a security interest continues in any identifiable proceeds of collateral including collections received by the debtor. Ind.Code §§ 26–1–9–201 & 306(2). We also reaffirm that Comment 2(c) is the law of Indiana: a recipient of a payment made "in the ordinary course" by a debtor takes that payment free and clear of any claim that a secured party may have in the payment as proceeds.[18] And we hold that whether a transfer of proceeds is "in the ordinary course" requires an assessment of both (1) the extent to which the payment was made in the routine operation of the debtor's business and (2) the extent to which the recipient was aware that it was acting to the prejudice of the secured party. Because we agree that "imposing liability too readily on payees ... could impede the free flow of goods and services essential to business," *J.I. Case*, 991 F.2d at 1277, we further hold that the transfer will be free of any claim that a secured party may have in it as proceeds

unless the payment would constitute a windfall to the recipient. A windfall occurs in this context when the recipient has no reasonable expectation of being paid ahead of a secured creditor because of the extent to which the payment was made outside the routine operation of the debtor's business, because of the extent to which the recipient was aware that it was acting to the prejudice of the secured party, or because of both of these factors in combination.

▮▮▮▮ While the determination of "ordinary course" is a question of law, sometimes an evaluation of the extent to which the payment was routine or the extent of the recipient's knowledge will require factual analysis. In such a situation, summary judgment would be inappropriate.[19]

## IV

Before applying these principles to the case before us, it is important to discuss *J.I. Case Credit Corp. v. First National Bank of Madison County*, 991 F.2d 1272 (7th Cir. 1993), a decision of the United States Court of Appeals for the Seventh Circuit applying Indiana law to a substantially identical problem. (*J.I. Case* served as the principal authority for the Court of Appeals in this case.)

As in the case before us, the debtor in *J.I. Case* deposited proceeds from the sale of secured agricultural equipment in his business checking account where it was commingled with funds from other sources. The debtor then used the commingled funds to pay creditors other than the secured creditor, including his bank lender. After careful analysis of whether these payments were "payments and transfers in ordinary course" within the meaning of Comment 2(c), the court concluded:

> [U]nder Comment 2(c), a payment is within the ordinary course if it was made in the

---

**16.** These categories are employed by the court in *J.I. Case Credit Corp. v. First Nat'l Bank of Madison County*, 991 F.2d 1272, 1278 (7th Cir.1993). We find that they correspond to our notion of awareness of prejudice to the secured party.

**17.** *See supra* note 9 concerning subordination agreements.

**18.** We reject the conclusion of the Iowa Supreme Court that Comment 2(c) does not affect U.C.C.

Article 9 priority rules. *See Linn Coop. Oil Co. v. Norwest Bank Marion, N.A.*, 444 N.W.2d 497, 499 (Iowa 1989).

**19.** *See Harley–Davidson Motor Co. v. Bank of New England–Old Colony, N.A.*, 897 F.2d 611, 622–23 (1st Cir.1990). Judge Kirsch found summary judgment inappropriate in this case for similar reasons. *HCC Credit Corp. v. Springs Valley Bank & Trust*, 669 N.E.2d 1001, 1005 (Ind.Ct.App.1996) (Kirsch, J., dissenting).

operation of the debtor's business and if the payee did not know and was not reckless about whether the payment violated a third party's security interest. 991 F.2d at 1279. The court held that the payments were made in the ordinary course of business and the secured party was not entitled to recover them because both (1) the bank did not know that the debtor's payments violated the secured party's security interest (although the bank did know about the secured party's security interest) and (2) the bank did not receive payments from the debtor in reckless disregard of the fact that those payments violated the secured party's security interest. *Id.; accord ITT Commercial Fin. Corp. v. Bank of the West,* 166 F.3d 295, 307 (5th Cir.1999).

Without expressing any view as to the outcome of *J.I. Case,* it is clear that the Seventh Circuit's approach focussed exclusively on the awareness of prejudice parameter. As discussed *supra* in footnote 16, we generally agree with this analysis. But the court did not independently examine the extent to which the debtor's payment to the bank was made in the routine operation of the debtor's business. For this reason, we decline to follow *J.I. Case.*

### V

■ We hold that Lindsey's payment of $199,122 to the bank here was not a payment in the ordinary course of the operation of Lindsey's business. There is no disagreement as to the following facts. *See* Record at 19–20; 374; 418. The bank was aware that HCC had a valid and perfected security interest in Lindsey's tractor inventory. The bank took this into account in making its decision to extend credit to Lindsey and did not take a security interest in any of the collateral covered by HCC's security agreement. During the eight years prior to the payment at issue here, Lindsey had borrowed funds or refinanced debt in excess of 100 times with the bank and the average debt balance owed was between $100,000 and $200,000. Two of the notes Lindsey paid off represented a refinancing of approximately $225,000 in continuing debt carried by the bank. After the notes were paid off, Lindsey was in the unprecedented position of owing the bank only between $2,000 and $15,000.

The bank's senior loan officer agreed with HCC's counsel that the $199,122 payment was "extraordinary" and constituted the largest ever made on any debt Lindsey owed the bank. The officer also said, "Anytime a significant loan balance is paid off you have to look at it as something that would not be a normal trade transaction, like paying interest or something like that."

The payment to the bank constituted the proceeds of collateral in which HCC had a valid and perfected security interest. The payment was used to liquidate a substantial secured debt which, for the most part, was not due. It was an extremely large payment, the likes of which Lindsey had never made before. And although the bank was not advised that the source of the payment it received constituted the proceeds of HCC's collateral, the bank knew of HCC's perfected security interest. As such, it had extended credit to Lindsey with the express understanding that HCC stood in a superior position to be repaid, at least in certain circumstances. We conclude that the payment was not in the ordinary course of Lindsey's business. For the bank to prevail would result in a windfall—a windfall because the bank had no reasonable expectation that Lindsey could or would liquidate its debt due the bank in advance of paying HCC for the tractors financed—at the expense of HCC which had taken all measures required by the U.C.C. to protect its interest. As a result, the exception to the Indiana U.C.C.'s priority rules provided by Comment 2(c) does not apply and HCC, not the bank, is entitled to the $199,122.

### Conclusion

Having previously granted transfer, thereby vacating the decision of the Court of Appeals, we now reverse the judgment of the trial court and remand this matter to the trial court with directions that summary judgment be entered for HCC and for any further proceedings that may be required.

SHEPARD, C.J., and DICKSON, SELBY, and BOEHM, JJ., concur.