**TROXEL EQUIPMENT CO.,**
**Appellant–Plaintiff,**

v.

**LIMBERLOST BANCSHARES,**
**Appellee–Defendant.**

No. 01A02–0503–CV–239.

Court of Appeals of Indiana.

Aug. 12, 2005.

Transfer Denied Nov. 16, 2005.

---

Rich M. Myers, David A. Feeback, Lautzenheiser, Myers & Holdman, PC, Bluffton, for Appellant.

Jeremy W. Brown, Burry, Herman, Miller & Brown, PC, Decatur, for Appellee.

## OPINION

BAKER, Judge.

Today we are faced with the question of whether the Uniform Commercial Code requires the proceeds of the sale of secured property to be deposited in a checking account before the "ordinary course of business" exception applies. We hold that it does not. Appellant-plaintiff Troxel Equipment Co. (Troxel) [1] appeals the trial court's grant of summary judgment in favor of appellee-defendant Limberlost Bancshares f/k/a Bank of Geneva (Bank).

---

1. We remind counsel for Troxel that the Summary of Argument section is to be "a *succinct*, clear and accurate statement of the arguments made in the brief." Ind. Appellate Rule 46(A)(7) (emphasis added). At nine pages, Troxel's "summary" is hardly what we would deem to be succinct. Moreover, "[t]he argument must include for each issue a *con-cise* statement of the applicable standard of review...." App. R. 46(A)(8)(b) (emphasis added). The total of seven pages that Troxel spent discussing the law of summary judgment is far from concise. We advise counsel to carefully consider to what use they put their allotted space in future appellate briefs.

Specifically, Troxel raises two issues, which we restate as whether Comment 2(c) of Indiana Code section 26–1–9–306 requires the Bank to return the proceeds of secured property to Troxel and whether the trial court's acknowledgment of a related case pending in another jurisdiction acted as a foreclosure of Troxel's claim in Adams County. Finding that the Bank was unaware that it could be acting to the prejudice of Troxel and that the payment was made in the routine operation of the debtor's business, we affirm the judgment of the trial court.

### FACTS

On January 12, 2000, Thomas Loy purchased from Troxel a John Deere combine (JD9500) for his farming operation in Jay County. The purchase price was $70,000. Loy made a down payment of $14,000 and financed the remaining $56,000 through John Deere Credit. The security agreement and loan contract included a repurchase agreement that required Troxel to repurchase the loan from John Deere Credit if Loy defaulted on the loan. The loan was to be paid in annual installments of $12,786.69 with the first annual payment due in January 2001. On January 18, 2000, John Deere Credit made a UCC–1 filing [2] with regard to the JD9500 in the Jay County Recorder's Office.

Loy had other unrelated loans from the Bank in Adams County. On August 30, 1999, Loy obtained a loan from the Bank in the amount of $52,008. The collateral for that loan was a 1992 John Deere grain table—also called a grain head—model # 920 and growing crops. The loan was to be repaid in full on or before November 30, 1999.

Within three weeks of purchasing the JD9500, Loy contacted Richard Uhlenhake

of Coldwater, Ohio for the purpose of putting farm equipment up for sale. Uhlenhake is a farmer, a part-time employee of a John Deere retailer, and an auctioneer who had previously auctioned farm equipment. Rather than auctioning the farm equipment, Uhlenhake informed Loy that he might be personally interested in purchasing the equipment. Uhlenhake called the Bank on January 31, 2000, and he asked, "if they held a lien—well, at first I said, you know, I'm interested in buying Tom Loy's combine and grain head. And do you have the lien on it? And they agreed, yes, we do." Appellant's App. p. 273.

On February 6, 2000, Loy sold the JD9500 and grain head to Uhlenhake for $52,500. The check from Uhlenhake was made out to "Tom Loy and Bank of Geneva," and the memo section of the check read, "JD9500 & 920 head." Appellant's App. p. 27. Loy and Uhlenhake further executed an agreement that Loy would "settle for any and all liens that he may have on the combine, grain head." *Id.* On February 17, 2000, Loy paid off the loan with the Bank by endorsing the check from Uhlenhake and delivering it to the Bank along with additional cash. Loy had previously obtained twenty-six loans from the Bank since 1992, all of which he had repaid in full with the exception of one for which payment was not due until March 19, 2004.

Loy failed to make his first annual payment to John Deere Credit on his loan for the JD9500. On May 25, 2001, Troxel filed a complaint against Loy for foreclosure of the security interest. Troxel received a default judgment on June 25, 2001. On August 7, 2001, Loy filed for Chapter 13 bankruptcy. The bankruptcy petition was

---

**2.** A UCC–1 filing is a financing statement filed with the County Recorder or the Indiana Sec-   retary of State, perfecting a security interest in collateral. *See* Ind.Code § 26–1–9.1.

dismissed on January 6, 2003. Loy again filed for bankruptcy on March 11, 2003. In both bankruptcy cases, Loy listed the JD9500 as an asset. Due to the bankruptcy filing, Troxel began searching for the JD9500 by contacting dealers in the area. In September 2003, Troxel received a phone call from the dealership in Ohio where Uhlenhake worked informing Troxel of where the JD9500 was located. On September 13, 2003, Uhlenhake confirmed to Troxel that he was the owner of the JD9500.[3]

After learning that Loy had sold the JD9500, Troxel filed a complaint in Adams County on October 17, 2003, against the Bank seeking the sum of $52,500—the proceeds of Loy's sale of the JD9500 to Uhlenhake. On September 30, 2004, Troxel filed a motion for partial summary judgment, asserting that there was no genuine issue of material fact as to Troxel's right to the proceeds attributable to the sale of the JD9500. The Bank responded and filed its own motion for summary judgment on December 13, 2004, asserting that it took the payment free and clear of any secured interest because it was received pursuant to the ordinary course of business exception.

On January 7, 2005, the trial court conducted a hearing on the summary judgment motions. Thereafter, the trial court entered its findings of fact and conclusions of law and judgment in favor of the Bank because the payment was received in the ordinary course of business. After devoting the majority of its findings to a discussion of the case law relevant to the ordinary course of business exception, the trial court went on to note that:

> The combine in question remains in the possession of Mr. Uhlenhake. Further,

the evidence shows that Troxel Equipment has filed suit in Mercer County, Ohio, and that Troxel Equipment, Mr. Uhlenhake and the Bank of Geneva are all parties in the Ohio suit concerning the same issues and the same combine. It appears to the Court that in light of the combine physically being located in the State of Ohio and the existence of a separate suit in the State of Ohio concerning the same matter, that the Ohio Court should resolve the issue.

Appellant's App. p. 344. Troxel now appeals.

## DISCUSSION AND DECISION

Troxel contends that the trial court erred in granting summary judgment in favor of the Bank. Specifically, Troxel argues that Comment 2(c) of Indiana Code section 26–1–9–306 does not authorize a recipient of the proceeds of secured property to retain the proceeds when they were not covered into the debtor's checking account and paid out in the operation of the debtor's business and that the trial court improperly considered the pending action in Ohio in its grant of summary judgment.

As we consider Troxel's arguments, we note that summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens*

---

**3.** Loy was later convicted of perjury for his false statements that he still owned the JD9500.

*Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.* Cross-motions for summary judgment do not alter the standard of review. Instead, the reviewing court will "consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Hendricks County Bank & Trust Co. v. Guthrie Bldg. Materials, Inc.,* 663 N.E.2d 1180, 1183 (Ind.Ct.App.1996). If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we will affirm. *Dunaway v. Allstate Ins. Co.,* 813 N.E.2d 376, 380 (Ind.Ct. App.2004). Finally, we note that where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. *Burgess v. E.L.C. Elec., Inc.,* 825 N.E.2d 1, 5 (Ind.Ct.App. 2005). Here, the facts are not in dispute, so we are faced with a question of law.

Although Indiana Code section 26–1–9–306 was replaced on July 1, 2001, the statute applies to this case as it was in effect in 2000, when all of the relevant events occurred. *See* Ind.Code § 26–1–9.1–709(a). In promulgating the 1972 version of Article 9 of the Uniform Commercial Code, the National Conference of Commissioners on Uniform State Laws (NCCUSL) appended Comment 2(c), which reads as follows:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in the ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from the transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

U.C.C. § 9–306 cmt. 2(c) (1972), 3 U.L.A. 441 (1981).

Our Supreme Court addressed the applicability of Comment 2(c) to Indiana law in *HCC Credit Corp. v. Springs Valley Bank & Trust,* 712 N.E.2d 952 (Ind.1999). In resolving this issue, the *HCC* Court first noted that "Comment 2(c) is not a statute and is not written in the form of a statute; it does not set forth a tightly worded rule, followed by equally tightly worded elements necessary to establish its application." *Id.* at 956. Comment 2(c) is an exception to the general priority rules of Indiana's Uniform Commercial Code; the recipient of a payment made in the ordinary course of business by a debtor takes that payment free and clear of any claims that a secured party may have in the payment as proceeds. *Id.*

The payment "(1) will be in the ordinary course if it was made 'in the operation of the debtor's business' but (2) will not be in the ordinary course if there was 'collusion with the debtor to defraud the secured party.'" *Id.* Whether a payment was

made in the ordinary course is a function of the extent to which the payment was made in the routine operation of the debtor's business and the extent to which the recipient was aware or should have known that it was acting to the prejudice of the secured party. *Id.* at 957. The synthesis of these two inquiries yields the result that the transfer of proceeds will be free of any claim that a secured party may have in it unless the payment would constitute a windfall to the recipient. *Id.* That is, when the recipient has no reasonable expectation of being paid ahead of a secured creditor because of the extent to which the payment was made outside the routine operation of the debtor's business and/or the extent to which the recipient was aware that it was acting to the prejudice of the secured party, the payment is a windfall and may not be kept by the receiver. *Id.*

When applying this analytical structure to the facts in *HCC,* our Supreme Court based its determination that the bank could not retain the proceeds upon several key facts. The bank knew that HCC had a valid and perfected security interest in the collateral, and the bank knew of HCC's interest at the time that it extended credit to the debtor. *Id.* at 959. The debtor refinanced with the bank more than one hundred times with an average debt balance between $100,000 and $200,000, but after making the payment at issue, the debtor was in the unprecedented position of owing the bank only between $2,000 and $15,000. The bank's loan officer acknowledged that this was "extraordinary." *Id.* Finally, a substantial portion of the debt paid off by the proceeds at issue was not yet due.

Troxel contends that the proceeds in this case cannot fall under Comment 2(c) because the check was not deposited into Loy's checking account before a second check was written by Loy to transfer the proceeds to the Bank. Although Comment 2(c) does discuss proceeds that "are covered into the debtor's checking account," Troxel's interpretation calls for a strictness and formality that *HCC* simply does not support. As the *HCC* Court noted, the "checking account" language is not a "tightly worded element" necessary to establish Comment 2(c)'s application. *HCC,* 712 N.E.2d at 956. The intent is met here, where Loy signed over to the Bank a check that was jointly issued to Loy and the Bank.

No one argues that the Bank acted in collusion with Loy to defraud Troxel. So the question is simply whether this transaction was within the ordinary course of Loy's business.

Taking the "awareness" prong first, we note that Troxel stated in its memorandum in support of its motion for summary judgment that "[t]here is no evidence that Plaintiff or Defendant took an active role or had actual knowledge of Loy's deception and misuse of the sale proceeds. Each is an innocent party." Appellant's App. p. 113. Additionally, the last loan that the Bank made to Loy occurred on August 30, 1999—five months before Loy purchased the JD9500. The Bank had no reason to check for UCC–1filings on an item that Loy had not yet purchased and never financed through the Bank. Although Uhlenhake did make an inquiry to the Bank regarding the "combine and grain head," he asked the Bank, "And do you have the lien on *it?* And they agreed, yes, we do." Appellant's App. p. 273 (emphasis added). Simply because the Bank knew it had a lien on the grain head but not on a combine that Loy owned does not put the Bank on notice that they might be receiving the proceeds from the sale of a combine in which another party had a security interest. Nor did the notation on Uhlenhake's check, "JD9500 & 920 head" put the

Bank on such notice. Appellant's App. p. 27. We therefore conclude, as the trial court did, that the Bank was unaware it could be acting to the prejudice of a secured party.

As to the "routine operation" prong, the evidence shows that the Bank had made a total of twenty-seven loans to Loy for his farming operation over the course of eight years, all of which had been repaid in full with the exception of the loan that was not yet due. Appellant's App. p. 77–79. The loan from the Bank was past due, so the Bank expected to be paid in full, just as it had been for the previous twenty-six loans it had made to Loy. No one at the Bank testified that they considered this payment to be in any way extraordinary. Although the payment was made late, Andrew Briggs, President of the Bank, noted that, "it is common for agricultural loans to be re-paid after the first of the year due to farmers often selling grain in the following year for tax advantage purposes." Appellant's App. p. 176. Therefore, we agree with the trial court that this payment was made in the routine operation of Loy's business.

Moreover, we conclude that this was not a windfall to the Bank because the Bank had a reasonable expectation of being paid ahead of Troxel because the payment was apparently made within the routine operation of Loy's business and the Bank was unaware that it was acting to the prejudice of Troxel. Thus, the payment was not a windfall, and the Bank may keep the proceeds.

Finally, we address Troxel's claim that the trial court improperly relied upon the pending Ohio action in granting summary judgment in favor of the Bank. In granting summary judgment, the trial court spent fourteen pages setting forth its well-reasoned discussion of facts and conclusions of law. After applying Comment 2(c) and *HCC* to the facts of this case and finding that the Bank was unaware it was acting to the prejudice of Troxel and that the payment was made in the routine operation of Loy's business, the trial court noted in a single paragraph that the JD9500 is the subject of an Ohio lawsuit. Appellant's App. p. 344. Because the JD9500 is located in Ohio, the trial court reasoned that the Ohio court was in the best position to resolve the dispute over the JD9500. It is clear to us from reading the trial court's findings that this paragraph was not the trial court's basis for granting summary judgment in favor of the Bank. The trial court was merely noting the existence of the lawsuit and informing Troxel where it could look for recovery of the JD9500 itself. We find no error on this basis.

We also note that public policy holds that he who is best able to avoid a loss should bear it. We recently discussed this policy and its application to the U.C.C. in *Provident Bank v. Tri–County Southside Asphalt, Inc.*, 804 N.E.2d 161, 165 (Ind.Ct. App.2004):

> The famous case of *Phelps v. McQuade*, 220 N.Y. 232, 115 N.E. 441 (1917), was the genesis of Uniform Commercial Code section 2–403. In *Phelps*, Gwynne falsely represented himself to a jewel vendor and obtained jewelry on credit from Phelps. Gwynne then sold the jewelry to McQuade. Phelps filed a claim for replevin of the jewelry, arguing that under common law title did not pass to McQuade. The *Phelps* court, however, noted that it was the "intention of the person having title to the goods and delivering them to another" that determined whether good title then passed to a purchaser for value. *Id.* at 442. Thus, the *Phelps* court held that Phelps had to bear the economic loss due to Gwynne's false representation be-

cause Phelps had dealt directly with Gwynne.

The Uniform Commercial Code drafters incorporated the sound policy behind the result in *Phelps.* The drafters noted that U.C.C. section 2–403 was "predicated on the policy that where a transferor has voluntarily delivered the goods to a purchaser, he, the transferor, ought to run the risk of the purchaser's fraud as against innocent third parties." U.C.C. § 2–403, comment 4 (2002). The policy is just inasmuch as he who deals directly with a person is in the best position to prevent a financial injury. See *M & K Corp. v. Farmers State Bank,* 496 N.E.2d 111, 112 (Ind.Ct.App.1986) (holding that the "employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees").

If Uhlenhake, a farmer and employee of a company that sells farm equipment, had checked the UCC–1 filings, he would have found a lien on the JD9500. He dealt directly with Loy and was in the best position to avoid the loss by searching more carefully for liens. Thus, the risk of loss—by losing possession of the JD9500 to Troxel—properly belongs with him.

The judgment of the trial court is affirmed.

RILEY, J., and MATHIAS, J., concur.